BARTON NAPHTHA COMPANY, D/B/U THE TRADE NAME OF BARTON SOLVENTS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

BARTON SOLVENTS COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 639–69, 640–69.   Filed April 21, 1971.

*Marvin F. Peterson,* for the petitioners.
*Ronald M. Frykberg,* for the respondent.

FAY, *Judge:* Respondent determined the following deficiencies in the income taxes of petitioners for the taxable years 1965 through 1967:

| Docket No. | | Year | Deficiency |
|---|---|---|---|
| 639–69 | { | 1965 | $3, 250 |
| | { | 1966 | 3, 250 |
| | { | 1967 | 3, 250 |
| 640–69 | { | 1965 | 3, 250 |
| | { | 1966 | 3, 250 |
| | { | 1967 | 3, 250 |

The sole issue presented is whether petitioner corporations are entitled to multiple surtax exemptions during the taxable years in question.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner Barton Naphtha Co. (hereinafter referred to as Barton-Naphtha), doing business under the tradename of Barton Solvents, Inc., and petitioner Barton Solvents Co. (hereinafter referred to as Barton-Solvents) are both Iowa corporations. At the time of the filing of their petitions in this case the principal offices of Barton-Naphtha and Barton-Solvents were located in Des Moines and Council Bluffs, Iowa, respectively. Petitioners filed their Federal income tax returns for the calendar years 1965, 1966, and 1967 with the district director of internal revenue, Des Moines, Iowa.

Barton-Naphtha was organized on January 2, 1951, for the purpose of engaging in the business of distributing industrial solvents and chemicals. The business activities of Barton-Naphtha covered primarily the vicinity of Des Moines, Iowa, but prior to the formation of Barton-Solvents also included to some extent the area of Omaha, Neb., and Council Bluffs, Iowa. In order to accommodate a demand for wider distribution in the Omaha and Council Bluffs region, a second corporation, Barton-Solvents, was organized on June 10, 1953, by F. C. Barton (hereinafter referred to as Barton), a principal shareholder and officer of Barton-Naphtha, and J. R. Thompson, a then employee of Barton-Naphtha. In the business judgment of the organizers of Barton-Solvents, the formation of a second corporation to service the new area was preferable to the expansion of the existing facilities of Barton-Naphtha. Following the incorporation of Barton-Solvents, J. R. Thompson was elevated from the position of salesman, which he had held at Barton-Naphtha prior thereto, to that of manager of Barton-Solvents.

The authorized capital of Barton-Solvents as originally provided by its articles of incorporation was $25,000, divided into 250 shares of common stock with a par value of $100 each. Thereafter, an amendment to the articles of incorporation filed with the secretary of the State of Iowa on October 21, 1958, increased the authorized capital to $50,000, divided into 500 shares of common stock with a par value of $100 per share. Neither the articles of incorporation nor the bylaws of Barton-Solvents at any time contained provisions regarding the imposition of restrictions upon the transfer of its stock.

The stock of Barton-Naphtha issued and outstanding during the taxable years in question consisted of one class of common stock possessing voting rights of one vote per share. On the final day of the calendar years 1965, 1966, and 1967 such stock was held as follows:

| Shareholder | Number of shares | | |
| --- | --- | --- | --- |
| | 1965 | 1966 | 1967 |
| F. C. Barton | 377 (87.88%) | 362 (84.38%) | 347 (80.89%) |
| Eugene Lukavsky | 13 | 13 | 13 |
| Sharon Jenn Barton | 13 | 18 | 23 |
| Barbara Barton | 13 | 18 | 23 |
| Karen Ann Barton | 13 | 18 | 23 |

The latter three, having the surname Barton, are daughters of F. C. Barton. The increases in their stock ownership between 1965 and 1966 and between 1966 and 1967 were attributable to their receipt of gifts from Barton during the month of December of the years for which the increase is reflected. During the period in question, Barton

was the president and Lukavsky was the secretary of Barton-Naphtha.

On December 31 of each of the taxable years 1965 through 1967 the stock of Barton-Solvents was owned as follows:

| Name of owner | Number of shares | Date issued |
|---|---|---|
| F. C. Barton | 91 | Jan. 2, 1963 (original shares—1953). |
| Eugene W. Lukavsky | 10 | Mar. 27, 1959. |
| Leon L. and Karen Ann Casten (husband and wife) jointly and to the survivor. | 10 | Jan. 2, 1963. |
| Larry M. Polich | 10 | July 9, 1959. |
| Russell L. and Janet A. Rains (husband and wife). | 10 | June 3, 1960. |
| Subtotal | 131 | |
| Barton-Solvents treasury stock | 46 | |
| Total shares | 177 | |

Of the individuals possessing a stock interest in Barton-Solvents, only Leon L. and Karen Ann Casten, the son-in-law and daughter of Barton, respectively, were related in any manner to Barton. During the period in question, Barton was the president, Leon Casten the vice president, Eugene W. Lukavsky the treasurer, and Russell L. Rains the secretary of Barton-Solvents. The directors of this corporation during the same period were Barton, Casten, and a Mr. Malacosky.

The shareholders of Barton-Solvents, excluding Karen Ann Casten who received five shares of stock as a gift from her father, were all employees of the corporation at the time stock was issued to them as well as during the taxable period in question. With the exception of stock held by Barton's daughter Karen, all the stock owned by the shareholder-employees of Barton-Solvents was a part of the corporation's original issue. The purchase price, in each case, was equal to the "book value" of the stock as reflected in the balance sheet. Book value was determined by reference to the net worth of the corporation, which, in turn, was defined as the total of capital stock plus surplus. The employees who were offered stock in Barton-Solvents were generally those holding managerial or supervisory positions in the corporation. Lukavsky, Casten, and Rains, all of whom possessed stock interests in the corporation during the years in question, were part of the management team. Polich, who similarly owned stock, was employed in the capacity of sales supervisor.

From the date of issuance until sometime after the close of the taxable period in question, the stock owned by all employees other than Barton was subject to a restrictive endorsement set forth on the face of the certificate representing such stock, which provided:

This certificate is issued subject to the following restrictions:

1. If the holder named in this certificate shall desire to sell any part or all

of the shares represented hereby, the same shall first be offered to the issuing corporation at book value, and the corporation shall have thirty days within which to accept such offer.

2. In the event of the death of the holder named in this certificate or if said holder shall leave the employment of the issuing corporation, then in either such event, the corporation shall have a thirty day option to purchase the shares represented thereby at book value.

The certificates evidencing the shares of stock owned by Barton were not similarly endorsed, nor restricted in any manner by conditions or agreements.

The 46 shares of treasury stock held by Barton-Solvents had been purchased from a former employee, Arthur W. Bovett, and his wife on August 30, 1962, for $19,394.06, or $421.61 per share. The certificate for the shares while held by Bovett was subject to the endorsement described in the certificate quoted above. The purchase price of Bovett's stock was computed on the basis of its then book value. At the time of the sale, Bovett was in the midst of his fourth or fifth year of employment with Barton-Solvents. The sale of stock to the corporation coincided with Bovett's voluntary resignation from employment, which event was motivated by personal considerations. To the date of trial, no other employee has sold, or expressed the desire to sell, his stock in the corporation. Since approximately 1965 Barton-Solvents has distributed dividends, roughly amounting to 5 percent of book value, to all shareholders of record.

From the date of issuance to the present, the book value of the stock approximately equaled its fair market value. As a result, the restrictions governing the disposition of the stock held by the employees other than Barton did not have any substantial effect on the fair market value of the stock.

The certificates representing the shares of Barton-Solvents owned by Eugene W. Lukavsky, Leon L. and Karen Ann Casten, and Russell L. and Janet A. Rains, all of which were endorsed as described in the certificate quoted above, were surrendered on March 29, 1968. The certificate for the shares owned by Larry M. Polich, which was similarly endorsed, was surrendered on January 22, 1968. On March 29, 1968, new certificates were issued to said shareholders. The certificate representing the shares previously held by Larry M. Polich was issued to Larry M. and Gloria Polich, jointly and to the survivor. The new certificates issued March 29, 1968, contained the following endorsement:

The shares represented by this certificate are subject to a purchase option and to the terms of an Agreement dated March 29, 1968.

Such agreement provided, in part:

THIS AGREEMENT entered into this 29th day of March, 1968, by E. W. LUKAVSKY, LEON CASTEN, LARRY POLICH, and RUSSELL L. RAINS, hereinafter called "Shareholders"; WITNESSETH:

&ast;    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;

WHEREAS, the Shareholders desire to enter into a "buy-sell" agreement with respect to their shares in Barton Solvents Co.; * * *

\* \* \* \* \* \* \*

Now, THEREFORE, in consideration of the mutual covenants expressed herein, each Shareholder does hereby bind himself, his heirs, executors, administrators and assigns, and agrees as follows:

1. No Shareholder will encumber or dispose of any shares in Barton Solvents Co. which he now owns except upon the terms and conditions hereinafter set forth, unless all other Shareholders consent thereto in writing.

2. Any Shareholder who desires to sell all or any part of his shares shall first offer the same to the other Shareholders at book value, each of whom shall have the right to purchase in proportion to the number of shares he then holds, subject to the terms of this Agreement, exclusive of the seller's shares. * * *

3. In the event a Shareholder ceases to be employed by one of the Companies, he must offer to sell his shares to the other Shareholders in the manner provided in Paragraph 2. All the terms and conditions of Paragraph 2 shall apply to any such offer.

4. Upon the death of a Shareholder, the other Shareholders shall have the option to purchase his shares from his executor or administrator. All the terms and conditions of Paragraph 2 shall apply to such offer.

On February 14, 1969, an "Election to Claim Multiple Surtax Exemptions Under Section 1562, Internal Revenue Code of 1954," with respect to taxable years 1965, 1966, and 1967, was filed by both petitioners with the district director of internal revenue at Des Moines, Iowa.

On their Federal income tax returns for the years 1965, 1966, and 1967 petitioners each claimed a surtax exemption of $25,000. Respondent determined that petitioners were component members of a controlled group of corporations during the years 1965 through 1967 and, allowing only one surtax exemption for both petitioners pursuant to section 1561, redetermined the income tax of petitioners. The deficiencies asserted failed to give recognition to the election by the corporate petitioners under section 1562 [1] to compute their taxes without regard to section 1561 (but pay an additional tax of 6 percent on the first $25,000 of income). The computation of petitioners' tax liability in accordance with the election would have produced lower deficiencies than those asserted. Respondent now concedes that petitioners were entitled to the benefits of a section 1562 election.

### OPINION

The sole issue presented is whether petitioners comprised a controlled group of corporations within the meaning of section 1563(a) during the taxable years in question. The effect of such a classification is to reduce the total number of surtax exemptions available to the

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

component members of such a group to one under section 1561(a).[2] This exemption is divided among the members of the group equally, or if each member consents to an apportionment plan, then in accordance with such plan.

Under section 1562, a controlled group of corporations may by election avoid the restrictions of section 1561. However, each member of such a group is then subject to an additional tax of 6 percent on the first $25,000 of its income. In the present case, the parties are agreed that an election under section 1562 was timely filed. Therefore, if petitioners are held to constitute a controlled group, they are entitled to the benefits of section 1562.

A brother-sister controlled group of corporations is defined in section 1563(a)(2) as a group of:

> (2) BROTHER-SISTER CONTROLLED GROUP.—Two or more corporations if stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of each of the corporations is owned (within the meaning of subsection (d)(2)) by one person who is an individual, estate, or trust.

In determining the percentage of stock ownership for purposes of the above provision, the meaning of the term "stock" is circumscribed in the manner provided by subsection (c). Under this provision treasury stock and certain nonvoting stock, referred to in the statute as "excluded stock," are not included in the definition of the term "stock" as employed by section 1561 through 1563. In addition, subsection (c) provides for the treatment of other stock as "excluded stock" under the conditions described in paragraph (2) thereof. As pertinent hereto, this provision reads:

> (c) CERTAIN STOCK EXCLUDED.—
>
> \*          \*          \*          \*          \*          \*          \*
>
> (2) STOCK TREATED AS "EXCLUDED STOCK."—
>
> \*          \*          \*          \*          \*          \*          \*
>
> (B) BROTHER-SISTER CONTROLLED GROUP.—For purposes of subsection (a)(2), if a person who is an individual, estate, or trust (referred to in this paragraph as "common owner") owns (within the meaning of subsection (d)(2)), 50 percent or more of the total combined voting power of all classes of stock

---

[2] SEC. 1561. SURTAX EXEMPTIONS IN CASE OF CERTAIN CONTROLLED CORPORATIONS.

(a) GENERAL RULE.—If a corporation is a component member of a controlled group of corporations on a December 31, then for purposes of this subtitle the surtax exemption of such corporation for the taxable year which includes such December 31 shall be an amount equal to—

(1) $25,000 divided by the number of corporations which are component members of such group on such December 31, or

(2) if all such component members consent (at such time and in such manner as the Secretary or his delegate shall by regulations prescribe) to an apportionment plan, such portion of $25,000 as is apportioned to such member in accordance with such plan.

The sum of the amounts apportioned under paragraph (2) among the component members of any controlled group shall not exceed $25,000.

entitled to vote or 50 percent or more of the total value of shares of all classes of stock in a corporation, the following stock of such corporation shall be treated as excluded stock—

\*       \*       \*       \*       \*       \*       \*

(ii) stock in such corporation owned (within the meaning of subsection (d)(2)) by an employee of the corporation if such stock is subject to conditions which run in favor of such common owner (or such corporation) and which substantially restrict or limit the employee's right (or if the employee constructively owns such stock, the direct owner's right) to dispose of such stock. If a condition which limits or restricts the employee's right (or the direct owner's right) to dispose of such stock also applies to the stock held by the common owner pursuant to a bona fide reciprocal stock purchase arrangement, such condition shall not be treated as one which restricts or limits the employee's right to dispose of such stock.

In the present case Barton was concededly an 80-percent or more shareholder of Barton-Naphtha. Whether his ownership of Barton-Solvents was also equal to or greater than 80 percent depends upon the treatment to be accorded the stock held by the employee-shareholders of that corporation other than Barton. If such stock is held to be excluded stock under section 1563(c)(2)(B), then Barton is regarded for purposes of this case as the sole shareholder of Barton-Solvents and accordingly petitioners must be classified as a controlled group of corporations. If the stock is not so excluded, Barton is then an owner of less than 80 percent of the stock of Barton-Solvents and the petitioners, lacking the necessary degree of common ownership, are not to be considered controlled corporations.

Respondent has taken the position that the stock owned by the employee-shareholders of Barton-Solvents, other than Barton himself, constituted "excluded stock" under section 1563(c)(2)(B). The conditions applicable to such stock by virtue of an endorsement on the face of the stock certificates extended to the corporation what is commonly referred to as the right of first refusal. Its provisions required shareholders desiring to sell their stock to first offer it for sale to the issuing corporation at book value, the corporation then having 30 days within which to accept such offer. The endorsement further granted the corporation a 30-day option to purchase the shares in the event of either the death of the employee or of his leaving the employ of the corporation. Respondent maintains that these conditions substantially restricted the right of the employees to dispose of their stock within the meaning of the statute. Since all other statutory requirements have clearly been satisfied under the facts of this case, it is the proper interpretation of the substantial-restriction requirements which underlies the present conflict.

In his contention that the restrictions herein satisfied the statutory requirements, respondent is firmly supported by the regulations. In

**114**

amplification of a statutory provision applicable to a parent-subsidiary group of corporations, similar to the provisions under consideration, section 1.1563–2(b)(2)(iii), Income Tax Regs., states:

In general, any condition which extends, directly or indirectly to the parent corporation or the subsidiary corporation preferential rights with respect to the acquisition of the employee's (or direct owner's) stock will be considered to be a condition described in the preceding sentence. It is not necessary, in order for a condition to be considered to be in favor of the parent corporation or the subsidiary corporation, that the parent or subsidiary be extended a discriminatory concession with respect to the price of the stock. *For example, a condition whereby the parent corporation is given a right of first refusal with respect to any stock of the subsidiary corporation offered by an employee for sale* is a condition which substantially restricts or limits the employee's right to dispose of such stock and runs in favor of the parent corporation. * * * [Emphasis supplied.]

These principles are expressly made applicable to brother-sister corporations by section 1.1563–2(b)(4)(ii), Income Tax Regs. Thus, a right of first refusal is considered to satisfy the statutory requirements of section 1563(c)(2)(B) in the case of brother-sister controlled groups. The above regulations echo the committee reports accompanying the enactment of the statute which explicitly treats a right of first refusal as a substantial restriction within the contemplation of the statute. See H. Rept. No. 749, 88th Cong., 1st Sess. 1964–1 C.B. (Part 2) 452. Thus, under both the regulations and the committee reports, petitioners constituted a controlled group of corporations within the meaning of section 1563.

In an effort to extricate themselves from the embrace of the unfavorable statutory provisions, petitioners argue: (1) That even if literally applicable, it was not the purpose of the statute to disallow a multiple surtax exemption in the present circumstances; (2) that under the facts of the case the restrictions contained on the face of the certificates were not substantial restrictions within the meaning of the statute; and (3) that, in any event, such restrictions were unenforceable under Iowa law.

We consider each of these contentions in order. The first contention of petitioners relates to the purpose of enactment of the provisions excluding certain stock owned by employees. Such purpose, petitioners claim, is to preclude the transfer of stock to employees for purposes of avoiding the provisions of section 1561. Thus, it is argued, the question of whether the statute is held applicable to a particular situation should depend upon the existence of improper motives. In the present case, since in petitioners' view the issuance of stock to the employees was motivated by legitimate business reasons rather than tax avoidance, petitioners maintain that no denial of multiple surtax exemptions was intended.

We note at the outset that the limitation upon the statutory provisions proposed by the petitioners is without authority in the statute. While congressional intent is frequently resorted to in ascertaining the proper meaning of unclear statutory provisions, it is the statutory language upon which such a determination must ultimately reside. In the present case, the statutory provisions are clear and intimate no dependency upon the existence of tax-avoidance motives. By force of such provisions alone, therefore, petitioners' contention must be rejected. However, even looking to the legislative history, as petitioners urge, we can find no support for petitioners' contention.

The enactment in 1964 of sections 1561 through 1563 limiting the number of surtax exemptions in the case of controlled corporations coincided with the reduction of the tax on the first $25,000 of corporate income from 30 to 22 percent. The general purpose of enactment of these restrictions is revealed in the following excerpt of the committee reports accompanying such legislation:

.While your committee recognizes the importance to small business of reducing the tax on the first $25,000 of income from 30 to 22 percent, it also recognizes that this substantial reduction should not provide added inducement to existing medium and large corporations to split up into multiple corporations. * * *

* * * * * * *

your committee believes, as it has in the past, that, where corporations owned and controlled by the same interests engage in different businesses in the same area or conduct the same type business in different geographical locales, there are legitimate business reasons for use of separate corporations and, therefore, the separate corporations should generally be recognized as separate taxpayers, retaining the benefit of use of multiple surtax exemptions. However, your committee does not intend to encourage the formation of these multiple corporations and therefore proposes to apply higher tax rates to corporations which are members of an affiliated group of corporations. * * * [H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964-1 C.B. (Part 2) 241-242.³]

The inclusion of the provisions relating to the exclusion of certain stock owned by employees in determining the percentage of common control is explained in the following manner:

certain outstanding stock, although owned by separate persons, could, unless neutralized for purposes of determining control, be used by some owners as a means of divesting themselves of sufficient stock to avoid the application of this section without, as a practical matter, divesting themselves of the benefits of ownership of a corporation. Therefore * * * stock of a subsidiary corporation owned by * * * employees of the corporation, if the stock is subject to conditions * * * will not be treated as outstanding stock * * * [H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964-1 C.B. (Part 2) 243.⁴]

As indicated above the purpose of section 1561 is to limit the number of surtax exemptions available to corporations owned by the same

---

³ Substantially the same language is found in S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964-1 C.B. (Part 2) 653-655.

⁴ See fn 3 supra.

interests. While use of multiple corporations as a method of conducting business may comport with bona fide business requirements, the allowance of a surtax exemption to each corporation confers unwarranted tax benefits upon the common shareholder. It is this duplication of surtax exemptions which prompted the enactment of sections 1561 through 1563. We think it clear, and petitioner has not contended otherwise, that the general application of these sections does not depend upon the existence of tax-avoidance motives. This is particularly apparent when such sections are contrasted with the related provisions of sections 269 and 1551, both of which focus upon the taxpayer's intentions. The present statute, on the other hand, establishes objective criteria based solely upon the presence of the requisite degree of common control. Any doubt as to the proposition that tax-avoidance motives are irrelevant to the operation of sections 1561 et seq. is eliminated by the committee reports quoted above which state that the alternative 6-percent additional tax provided by section 1562 was included in recognition of the frequently legitimate use of the multiple corporate form of conducting business. Thus, it is clear that the absence of tax-avoidance motives constitutes no bar to the denial of multiple surtax exemptions to controlled corporations under section 1561.

By the same token, we think the specific provision in question excluding certain stock held by employees from the determination of stock ownership does not require the existence of tax-avoidance motives. The exclusion of such stock is no more than a special refinement upon the 80-percent common ownership requirement designed to assure the denial of multiple surtax exemptions where the common shareholder owns less than 80 percent of the stock but enjoys the prohibited degree of control as a result of restrictions applicable to the stock held by outsiders. Given the presence of such control, we think that the statute mandates the denial of multiple exemptions for the same reasons generally applicable to controlled corporations, irrespective of the absence of tax-avoidance motives. Any contrary interpretation of the statute would permit a shareholder possessing the prohibited degree of control to derive precisely the unwarranted benefits from multiple incorporation which the statute was intended to defeat.

Petitioners next contend that the restrictions applicable to the employees' stock in the present case were not substantial within the contemplation of the statute. The restrictive endorsement herein granted a right of first refusal to the corporation requiring the corporation to pay book value upon its purchase of the stock. Petitioners take the position that since the book value was equal to fair market value, the restriction did not substantially inhibit the proprietary interests of the employees in the stock. As petitioners interpret the statutory provisions, only such restrictions which have a material effect upon the voting or dividend rights, value, or other incidents of

ownership of the stock, are to be considered substantial within the meaning of the statute. In light of the statutory purposes and legislative history, described above, we think petitioners misconstrue the provisions in question.

The purpose of excluding stock owned by employees, subject to restrictions upon their right of disposition, has been described above. In emphasizing such attributes of ownership as voting and dividend rights or the shareholder's ability to realize full market value on the sale of stock, petitioners ignore the critical requirement that the restrictions relate to the right of disposition, rather than incidents of ownership, of the employees. In this connection we note that the statute does not treat stock subject to substantial restrictions as if owned by the common shareholder. Instead the stock is "neutralized" for purposes of determining stock ownership by regarding such stock as nonexistent. Such treatment of excluded stock is to be contrasted with the constructive ownership provisions of subsection (e) which attribute the ownership of stock by one individual to another. It is plainly the use of substantial restrictions as a method of retaining the reins of corporate control which is the sole concern of the statute. Accordingly, in determining what constitutes a substantial restriction, the focus of inquiry is properly upon the rights reserved to the common shareholder (or corporation) rather than the contraction of the employee's incidents of ownership. The right of first refusal in favor of the corporation involved in the present case clearly augmented the degree of control enjoyed by the common shareholder. Indeed it appears that such a restriction, cited by both the committee reports and the regulations as an illustration of a substantial restriction, is precisely the situation envisioned by Congress. We therefore regard the conditions applicable to the stock of the employees herein as a substantial restriction within the meaning of section 1563(c)(2)(B).

Petitioners' final contention is that the restrictive endorsement applicable to the stock of the employees was invalid under local law. Accordingly, petitioners maintain that the stock was not in fact restricted for Federal tax purposes. Respondent's position is that the restrictions were valid.

It is well settled under the law of Iowa that reasonable restrictions upon the sale of stock are valid. *McDonald* v. *Farley & Loetscher Mfg. Co.*, 226 Iowa 53, 283 N.W. 261 (1939); *Elson* v. *Security State Bank of Allerton*, 246 Iowa 601, 67 N.W. 2d 525 (1954). Moreover, prohibition upon the transfer of a corporation's stock to an outsider until the corporation has been given an opportunity to purchase such stock has been held to be a reasonable restriction. *McDonald* v. *Farley & Loetscher Mfg. Co.*, *supra*. However, it is petitioners' position that such a restriction must be contained in either the articles of incorporation or bylaws of the corporation. In support of this assertion peti-

tioners cite Iowa Code Ann. sec. 491.5 and several Iowa cases. The cited statute provides as relevant hereto:

Sec. 491.5   Articles adopted and recorded.

Before commencing any business except their own organization, they must adopt articles of incorporation, * * *

Such articles shall contain:

\*          \*          \*          \*          \*          \*          \*

3. The amount of authorized capital stock, the classes of stock and number of shares authorized, with the par value and conditions of each class of such shares, and the time when and conditions under which it is to be paid in.

Petitioners understand this provision to require the inclusion in the articles of incorporation of the restrictions upon disposition applicable to such stock. However, they cite no cases to support this construction of the statute. We are inclined to the view that the Iowa statute, in requiring the description of classes of stock and conditions of each class in the articles, does not refer to mere restrictions upon disposition applicable to some portion of a single class of stock. This conclusion we believe is compelled by the case of *Elson* v. *Security State Bank of Allerton*, *supra*, in which the court upheld the validity of a *bylaw* imposing restrictions upon the sale of stock, although the articles of incorporation were silent in this respect. The clear inference of such a holding is that the validity of restrictions upon the disposition of stock does not depend upon their inclusion in the articles of incorporation.

Petitioners also cite *McDonald* v. *Farley & Loetscher Mfg. Co.*, *supra*, and *Mason* v. *Mallard Telephone Co.*, 213 Iowa 1076, 240 N.W. 671 (1932), for the proposition that restrictions which are outside the articles or bylaws are invalid. Each of the cited cases upheld the validity of reasonable restrictions upon alienability of stock which are contained in the articles of incorporation, the former dealing with a right of first refusal and the latter with a provision requiring the transfer of stock to be approved by two directors of the corporation. Petitioners would infer from these cases that restrictions which are not contained in the articles are invalid. However, what has been stated with reference to a similar inference from the Iowa statute is equally applicable here. Nothing in the cited cases suggests that the restrictions must arise from provisions in the articles of incorporation. Clearly the import of these decisions is not to limit the validity of restrictions to those contained in the articles of incorporation since the *Elson* case establishes the enforceability of bylaw restrictions as well. Thus, the cited cases must be understood as establishing the validity of reasonable restrictions rather than the formalities necessary to create such restrictions.

The question of the validity of reasonable restrictions contained exclusively in the certificate representing the stock has not been specifically treated in any Iowa cases that have come to our attention.

However, there is nothing in the cases cited by petitioners which suggests that such restrictions would not be upheld as a contract between the corporation and shareholders or between the shareholders *inter se*. The cases of other jurisdictions do in fact recognize the validity of such contractual restrictions. Thus, in *Doss* v. *Yingling*, 95 Ind. App. 494, 172 N.E. 801 (1930), a restriction contained in an invalid bylaw was upheld on the basis that the bylaw evidenced an effective agreement between the shareholders and the corporation. To the same effect see *Krauss* v. *Kuechler*, 300 Mass. 346, 15 N.E. 2d 207 (Sup. Jud. Ct. 1938).[5] In the instant case the certificates of stock issued by the corporation to the employees as part of the original issue expressly stated that it was subject to specified conditions. Under such circumstances we believe that the courts of Iowa would enforce such restrictions on a contractual basis although the instructions were stated neither in the articles nor the bylaws of the corporation. It is significant, in this respect, that the Iowa cases of *Mason* v. *Mallard Telephone Co.*, *supra*, and *McDonald* v. *Farley & Loetscher Mfg. Co.*, *supra*, adopt a contractual theory as the underlying basis of the validity of reasonable restrictions upon transfers contained in articles or bylaw provisions.

Respondent has advanced an alternative argument in support of the deficiencies based upon the petitioners' filing of an election pursuant to section 1562. It is respondent's position that such filing establishes the status of petitioners as a group of controlled corporations since withdrawal of such an election requires the Commissioner's consent. While we are inclined toward the posture of petitioners that such an election is effective only if petitioners are in fact a group of controlled corporations, in view of our conclusions as to the merits of petitioners' claim we do not reach such issue.

*Decisions will be entered under Rule 50.*

---

[5] See also 12 Fletcher Cyclopedia Corporations, sec. 5454, p. 306, and note "Restrictions upon transfer of stock, while not a valid bylaw, are none the less binding upon the parties as a contract," 38 Va. L. Rev. 103.