MID–AMERICA INDUSTRIES, INC., a Delaware corporation, et al., Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

No. 72–1515.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 15, 1973.

Decided April 20, 1973.

Rehearing Denied May 25, 1973.

Ben L. Paddock, Fort Smith, Ark., for appellee.

Thomas L. Stapleton, Atty., Tax Div., Dept. of Justice, Washington, D. C., for appellant.

Before HEANEY and BRIGHT, Circuit Judges, and BENSON, Chief District Judge.*

HEANEY, Circuit Judge.

The United States appeals from a decision of the trial court awarding taxpayers a refund of $36,561.04, plus interest, for corporate taxes paid under protest for calendar years 1964–1967. The sole issue on this appeal is whether

* District of North Dakota, sitting by designation.

the taxpayers constituted a "controlled group of corporations" under § 1563 of the Internal Revenue Code of 1954.[1]

The Automotive, Inc. (Automotive), a closely held Delaware corporation, headquartered in Fort Smith, Arkansas, began business as a jobber of automobile parts in 1920.[2] By 1957, it had a number of branch offices located in various cities throughout Arkansas, Oklahoma, and Texas. At that time, Automotive's management decided to divide this structure into a number of smaller subsidiary corporations, each of which would own and operate stores located within a particular trade area. These subsidiaries were organized as of the beginning of the year 1958. Employees of Automotive, the various subsidiaries and two other firms historically associated with Automotive,[3] were allowed to purchase between twenty-one and twenty-three percent of the shares of the single class of common stock issued by each of the subsidiaries, with Automotive owning the remainder.

Simultaneously with the establishment of the subsidiaries, Automotive caused another corporation, Automotive Employees Securities Corporation (Securities Corporation), to be formed. The sole purpose of Securities Corporation was to maintain a market for the stock in the subsidiaries held by the employees.[4] To facilitate this purpose, the stock of each subsidiary was issued subject to conditions restricting its transfer.[5] The conditions required that

1. All statutory citations herein are to the Internal Revenue Code of 1954, 26 U.S.C.

2. The facts are more fully set out in the published Memorandum Opinion of the trial court. Mid-America Industries, Inc. v. United States, 341 F.Supp. 597 (W.D. Ark.1972).

3. These firms are The Automotive, Inc. of Tulsa and Motive Parts Warehouse, Inc. The ownership of these two other firms during the pertinent tax years was different from that of Automotive, but they were offshoots of Automotive. In 1969, Automotive and Motive Parts Warehouse, Inc., were reunited through a reorganization in which Mid-America Industries, Inc., became the parent.

4. The incorporators of Securities Corporation were: C. R. Warner, Jr., Heartsill Ragon and John Safford. Automotive for many years was a client of the law firm in which Mr. Warner and Mr. Ragon were partners, and of the accounting firm in which Mr. Safford was a partner. These three men remained the sole shareholders, officers and directors of Securities Corporation until the end of 1966, when they sold their stock to a group of fourteen men who were employed by either Automotive or Motive Parts Warehouse, Inc.

5. The conditions to which the stock was subject are as follows:
"No transfer of common stock of this Corporation shall be valid, whether by sale, gift, devise, inheritance, operation of law, levy or legal process, foreclosure of lien, or otherwise, until thirty (30) days after the Company, through its Secretary, shall have had written notice by certified mail of the proposed transfer, and the number of shares proposed to be transferred. During such thirty-day period the Automotive Employees Securities Corporation, an Arkansas corporation, shall have the sole option to buy said shares at the book value as shown by the books of the corporation at the last preceding annual audit, less dividends paid thereafter. Such option may be exercised by the Automotive Employees 'Securities Corporation' by written notice to the last known address of the shareholder of record within the option period. This option in favor of Automotive Employees Securities Corporation shall also arise whenever the owner of any share, or shares, of common stock ceases to be an active employee for whatever cause—resignation, retirement, discharge, transfer or otherwise, of the one of the following companies by which he is employed at the time he acquires said stock:
[There follows a list naming all the Subsidiaries.]
said option to be exercised as set forth above within thirty (30) days of the termination of said active employment. Payment for such shares shall be in cash upon surrender of the certificate or certificates for said shares, properly endorsed.
"If the aforesaid option shall not be exercised by optionee within the prescribed time, then said share or shares may be retained or transferred to any person whomsoever, provided, however,

notice of all proposed stock transfers be given to the respective subsidiary corporations, and that for thirty days after said notice, Securities Corporation had the sole option to purchase the stock at its most current book value. An option in favor of Securities Corporation also arose whenever any stockholder terminated his employment with Automotive or an affiliated firm. Securities Corporation was informed of each notice of proposed sale and employment termination by the parent or the subsidiaries, and it consistently purchased the subsidiaries' stock when its option arose and resold the stock to other employees.

In preparing their tax returns for the tax years at issue, Automotive and each of the subsidiaries availed themselves of the exemption from the corporate surtax which is provided to most corporations for their first $25,000 of income. See, 26 U.S.C. § 11(d). The returns were audited by the Internal Revenue Service. The I.R.S. determined that Automotive and its subsidiaries constituted a "controlled group of corporations" as that term is used in §§ 1561–1563 of the Code. Consistent with that determination, the Commissioner allowed this group of corporations (the taxpayers) only one surtax exemption among them, and disallowed the other fifteen surtax exemptions. Following notice of the Commissioner's action, the taxpayers elected, under § 1562 of the Code, to retain their surtax exemptions, and to pay an additional six percent tax rate on the first $25,000 of income of each corporation. Thereafter, they filed this suit be-

low to recover the additional six percent paid, contending that they were not members of a controlled group as defined by the statute.

Section 1563(a)(1) of the Code defines the term "controlled group of corporations" to include a parent corporation and its subsidiaries in which the parent owns eighty percent or more of the outstanding stock. However, in computing the parent's percentage ownership of subsidiaries in which it holds an interest in excess of fifty percent, certain outstanding stock is excluded by § 1563(c)(2)(A) from consideration. Because of this exclusion, a parent may be deemed to own in excess of eighty percent even though it holds legal title to a lesser percentage of the outstanding stock, if the employee-owned stock of the subsidiary is:

"* * * subject to conditions [1] which run in favor of such parent (or subsidiary) corporation and [2] which substantially restrict or limit the employee's right * * * to dispose of such stock * . * *."

26 U.S.C. § 1563(c)(2)(A)(iii).

The parties agree that the second requirement of the excluding provision is met. They also agree that employees of the respective subsidiaries owned a sufficient portion of the stock of each subsidiary. so that if the conditions were found to "run in favor of" Automotive, then Automotive is properly deemed to have owned in excess of eighty percent of each subsidiary's stock. Thus, the only question before us is whether or not the conditions ran in favor of Auto-

---

that failure of optionee to purchase any share or shares of common stock under its option, and the sale or transfer to any other person, or the retention of said shares by an ex-employee, shall not as to the future sale or transfer of said shares or share, or of any share or shares issued in lieu thereof, discharge any such share or shares of common stock from any of the restrictions herein contained; it being the intent that all restrictions hereby imposed upon the sale or transfer of shares of common stock shall apply to all such shares,

whensoever, howsoever or by whomsoever acquired in the hands of all holders or owners, whether original shareholders or subsequent purchasers or transferees and whether acquired through the voluntary or involuntary act of a shareholder, or by operation of law, and whether a part of the first authorized issue or of any subsequent or increased issue. In the event that any share, or shares, shall be transferred or retained in violation of this restriction, then payment of all dividends shall be suspended upon said share of stock forthwith."

motive. The trial court held that they did not. We disagree.

The phrase "run in favor of" is receptive of a number of different interpretations. We are convinced that Congress intended that the phrase should be interpreted far more broadly. Moreover, we believe that the restrictions ran in favor of Automotive because, as a practical matter, it had not given up its control over the disposition of the subsidiaries' stock.

We agree with the trial court's finding that the conditions on their face ran in favor of Securities Corporation. However, we are convinced that, in reality, they ran in favor of Automotive because Automotive had ultimate control over the disposition of the stock of the subsidiary corporations. Automotive at all times owned between seventy-seven and seventy-nine percent of the stock in each of the subsidiaries. Moreover, because of its large interest in each subsidiary, Automotive maintained dominant control over the subsidiaries and could, at its discretion, alter the conditions restricting the transfer of the subsidiaries' stock. See, Superior Beverage Co. of Marysville, Inc., 58 T.C. 918, 928–931 (1972). For example, if Automotive at anytime became displeased with the manner in which Securities Corporation was conducting the purchase and sale of the stock of the subsidiary corporations, it could, by exercising its control over the subsidiaries, alter the conditions so that they no longer purported to run in favor of Securities Corporation. Such an action would take away Securities Corporation's sole function and reduce it to inactivity. Automotive could then cause the conditions to directly "run in favor of" a more amenable third party, or itself. Similarly, in the event that an employee of either Automotive, or one of its subsidiaries, exercised his stock ownership rights contrary to the interest and desires of Automotive, Automotive could cause the termination of his employment and thereby force the sale of his stock. The advantage of Automotive's power was evident. Through it, Automotive could maintain ultimate control over the disposition of stock in the subsidiaries which is technically owned by outsiders. It was able to indirectly maintain the same control as can a parent corporation in whose favor transfer restrictions run directly. The latter arrangement is clearly denied full benefit of the multiple surtax exemptions and tax reduction by §§ 1561–1563 of the Code, and we are of the view that the former indirect arrangement is as well.

The reports of the House of Representatives Ways and Means Committee and the Senate Finance Committee relating to the Revenue Act of 1964, of which §§ 1561–1563 are a part,[6] emphasize that the purpose of the surtax exemption was to aid small, rather than medium and large, businesses. H.R. Rep. No. 749, 88th Cong., 1st Sess. 116–118 (1963); S.Rep. No. 830, 88th Cong., 2d Sess. 148–150 (1964), U.S.Code Cong. & Admin.News, p. 1313. Moreover, these reports state that Congress intended by these specific sections to provide additional aid to small businesses by reducing the tax on the first $25,000 of income from thirty to twenty-two percent, and that it desired that these benefits should be limited "in the cases where a parent corporation *owns or controls* one or more other corporations * * *." (Emphasis added.) H.R.Rep. No. 749, *supra* at 117; S.Rep. No. 830, *supra* at 149, U.S.Code Cong. & Admin.News, p. 1426.

■ We believe that in order to effect Congress's intent, in interpreting the phrase "run in favor of," courts must go beyond a mere formal ownership test and closely examine the question of control. The following observations of the Tax Court in Barton Naphtha Co., 56 T.C. 107, 116–117 (1971), lend support to this position:

"The exclusion of * * * [restricted employee-owned] stock is no more

---

6. Act, of February 26, 1964, Pub.L.No. 88–272, § 235, 78 Stat. 19, 116–125.

than a special refinement upon the 80 percent common ownership requirement designed to assure the denial of multiple surtax exemptions where the common shareholder owns less than 80 percent of the stock *but enjoys the prohibited degree of control as a result of restrictions applicable to stock held by outsiders.*

\*    \*    \*    \*    \*    \*

" \*    \*    \* In emphasizing such attributes of ownership as voting and dividend rights or the shareholder's ability to realize full market value on the sale of stock, petitioners ignore the critical requirement that the restrictions relate to the right of disposition, rather than incidents of ownership, of employees \*    \*    \*. *It is plainly the use of substantial restrictions as a method of retaining the reins of corporate control which is the sole concern of the statute.*" (Emphasis added.)

■ There is no doubt in our minds but that Automotive had maintained the "prohibited degree of control," and that the conditions indirectly ran in favor of Automotive. Section 1563(c)(2)(A)(iii) does not require that the conditions run *directly* in favor of the parent or subsidiary, but instead conditions which *indirectly* favor either the parent or subsidiary should also cause the stock to be excluded. See, Treas.Reg. § 1.1563–2(b)(2)(iii) (1965). A contrary position would, in our view, put form over substance. Nor does it matter that the corporate structure involved predated the enactment of §§ 1561–1563. Con-

gress specifically stated that this statute would have the effect of denying the full benefits of the tax reduction to "medium and large enterprises *which use, or might choose to use,* the multiple corporate form of organization." (Emphasis added.) H.R.Rep. No. 749, *supra* at 117; S.Rep. No. 830, *supra* at 149,[7] U.S.Code Cong. & Admin.News, p. 1426. Accordingly, we hold that the taxpayers were members of a "controlled group of corporations," and that they were subject to the additional six percent tax imposed by § 1562 on multiple corporations which elect to retain separate surtax exemptions.

Reversed.

---

7.  The committees also stated:
    "While your committee recognizes the advantages of use of multiple corporations, your committee believes, as it has in the past, that, where corporations owned and controlled by the same interests engage in different businesses in the same area or conduct the same type business in different geographical locales, there are legitimate business reasons for use of separate corporations and, therefore, the separate corporations should generally be recognized as separate taxpayers, retaining the benefit of

use of multiple surtax exemptions. *However, your committee does not intend to encourage the formation of these multiple corporations and therefore proposes to apply higher tax rates* [—the six percent additional income tax rate on the first $25,000 income of each corporation—] *to corporations which are members of an affiliated group of corporations.* \*    \*    \* " (Emphasis added.)
    H.R.Rep.No.749, *supra* at 118; S.Rep. No.830, *supra* at 149–150, U.S.Code Cong. & Admin.News, p. 1426.