CROW-BURLINGAME CO. OF PINE BLUFF, ET AL.,[1] PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3132-74—3142-74.    Filed January 22, 1976.

*Lewis H. Mathis* and *Raymond R. Morris,* for the petitioners.
*H. Steven New,* for the respondent.

[1] Cases of the following petitioners are consolidated herewith: Crow-Burlingame Co. of Conway, docket No. 3133-74; Crow-Burlingame Co. of Stuttgart, docket No. 3134-74; Crow-Burlingame Co. of Smackover, docket No. 3135-74; Crow-Burlingame Co. of Hot Springs, docket No. 3136-74; Crow-Burlingame Co. of Magnolia, docket No. 3137-74; Crow-Burlingame Co. of Hope, docket No. 3138-74; Crow-Burlingame Co. of Warren, docket No. 3139-74; Crow-Burlingame Co. of Dumas, docket No. 3140-74; Crow-Burlingame Co. of Harrison, docket No. 3141-74; Crow-Burlingame Co. of Searcy, docket No. 3142-74.

OPINION

Section 1561(a)(1)[4] provides that if a group of corporations constitutes a "controlled group of corporations" on a December 31, the component members of the group for the taxable year in which that date falls are entitled to a single surtax exemption, divided among them equally or in accordance with an approved apportionment plan. Under section 1562,[5] however, a "controlled group of corporations" may elect each to enjoy a $25,000 surtax exemption, but a penalty is extracted in the form of an increase in the surtax rate in return for this privilege. For prior years, petitioners made this election, but they here deny they are liable for this surtax penalty for 1970. The meat of this controversy is whether they were a "controlled group of corporations" on December 31, 1970, and are thus subject to the section 1562 additional surtax for the calendar year ending on that date.

The term "controlled group of corporations" is defined by section 1563(a)(1)[6] to include a chain of corporations with a

---

[4] SEC. 1561. LIMITATIONS ON CERTAIN MULTIPLE TAX BENEFITS IN THE CASE OF CERTAIN CONTROLLED CORPORATIONS.

(a) GENERAL RULE.—The component members of a controlled group of corporations on a December 31 shall, for their taxable years which include such December 31, be limited for purposes of this subtitle to—

(1) one $25,000 surtax exemption under section 11(d),

[5] Sec. 1562 was repealed with respect to taxable years beginning after Dec. 31, 1974, by sec. 401(a)(2) of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487.

[6] SEC. 1563. DEFINITIONS AND SPECIAL RULES.

(a) CONTROLLED GROUP OF CORPORATIONS.—For purposes of this part, the term "controlled group of corporations" means any group of—

(1) PARENT-SUBSIDIARY CONTROLLED GROUP.—One or more chains of corporations connected through stock ownership with a common parent corporation if—

(A) stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of each of the corporations, except the common parent corporation, is owned (within the meaning of subsection(d)(1)) by one or more of the other corporations; and

(B) the common parent corporation owns (within the meaning of subsection(d)(1)) stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of at least one of the other corporations, excluding, in computing such voting

common parent corporation which owns at least 80 percent of the voting stock of each of the subsidiaries. In computing such 80-percent ownership, certain categories of stock, referred to in section 1563(c) as "excluded stock," are not taken into account. The "excluded stock" category with which we are here concerned, sec. 1563(c)(2)(A)(iii),[7] is stock in a subsidiary corporation (whose parent owns 50 percent of its stock) owned by an employee of the subsidiary where the employee's stock is subject to "conditions which run in favor of such parent (or subsidiary) corporation" and substantially restrict or limit the employee's right to dispose of his stock.

The parties agree that the repurchase option to which the stock of the employees of the petitioner-subsidiaries was subject constituted a substantial restriction on the employee-owners' disposition rights. The controverted issue is whether that restriction ran "in favor" of either Crow-Burlingame or the petitioner-subsidiaries. If so, the employees' stock must be excluded from the computations in determining whether Crow-Burlingame owned 80 percent of the stock of the petitioner-subsidiaries, and, if the employees' stock is so excluded, the petitioner-subsidiaries were a controlled group of corporations subject to the additional surtax. On the other hand, if that option did not run "in favor" of Crow-Burlingame or the petitioner-subsidiaries, the petitioner-subsidiaries were not a controlled group of corporations, and each petitioner is entitled to a $25,000 surtax exemption without paying the section 1562 additional surtax.

power or value, stock owned directly by such other corporations.
[7] Sec. 1563(c)(2)(A)(iii) provides as follows:

(c) CERTAIN STOCK EXCLUDED.—

* * *

(2) STOCK TREATED AS "EXCLUDED STOCK".—

(A) PARENT-SUBSIDIARY CONTROLLED GROUP.—For purposes of subsection (a)(1), if a corporation (referred to in this paragraph as "parent corporation") owns (within the meaning of subsections (d)(1) and (e)(4)), 50 percent or more of the total combined voting power of all classes of stock entitled to vote or 50 percent or more of the total value of shares of all classes of stock in another corporation (referred to in this paragraph as "subsidiary corporation"), the following stock of the subsidiary corporation shall be treated as excluded stock—

* * *

(iii) stock in the subsidiary corporation owned (within the meaning of subsection (d)(2)) by an employee of the subsidiary corporation if such stock is subject to conditions which run in favor of such parent (or subsidiary) corporation and which substantially restrict or limit the employee's right (or if the employee constructively owns such stock, the direct owner's right) to dispose of such stock, * * *

The following explanation of the "excluded stock" provisions of section 1563(c)(2)(A)(iii) in S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964-1 (Part 2) C.B. 655, is instructive:

certain outstanding stock, although owned by separate persons, could, unless neutralized for purposes of determining control, be used by some owners as a means of divesting themselves of sufficient stock to avoid the application of this section without, as a practical matter, divesting themselves of the benefits of ownership of a corporation. Therefore, in determining whether a parent-subsidiary controlled group exists, stock of a subsidiary corporation owned by * * * employees of the subsidiary if the stock is subject to restrictions which favor the parent or subsidiary corporation * * * will not be treated as outstanding stock if the parent corporation owns 50 percent or more of the value or voting power of the stock of the subsidiary. * * *

See also H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964-1 (Part 2) C.B. 445, 452.[8]

The term "conditions which run in favor" of a parent or subsidiary corporation as used in section 1563(c)(2)(A)(iii) has been the subject of a recent opinion in *Mid-America Industries, Inc. v. United States,* 477 F.2d 1029 (8th Cir. 1973), in which the facts were similar in crucial respects to the facts of the instant case. In that case, corporation A, a jobber of automobile parts,

---

[8] Sec. 1.1563-2(b)(2)(iii), Income Tax Regs., is as follows:

(b) *Stock treated as excluded stock—*
* * *

(2) *Stock treated as not outstanding.* If the provisions of this subparagraph apply, then for purposes of determining whether the parent corporation or the subsidiary corporation is a member of a parent-subsidiary controlled group of corporations within the meaning of paragraph (a)(2) of section 1.1563-1, the following stock of the subsidiary corporation shall, except as otherwise provided in paragraph (c) of this section, be treated as if it were not outstanding:
* * *

(iii) *Employees.* Stock in the subsidiary corporation owned (directly and with the application of the rules contained in paragraph (b) of section 1.1563-3) by an employee of the subsidiary corporation if such stock is subject to conditions which substantially restrict or limit the employee's right (or if the employee constructively owns such stock, the direct owner's right) to dispose of such stock and which run in favor of the parent or subsidiary corporation. In general, any condition which extends, directly or indirectly, to the parent corporation or the subsidiary corporation preferential rights with respect to the acquisition of the employee's (or direct owner's) stock will be considered to be a condition described in the preceding sentence. It is not necessary, in order for a condition to be considered to be in favor of the parent corporation or the subsidiary corporation, that the parent or subsidiary be extended a discriminatory concession with respect to the price of the stock. For example, a condition whereby the parent corporation is given a right of first refusal with respect to any stock of the subsidiary corporation offered by an employee for sale is a condition which substantially restricts or limits the employee's right to dispose of such stock and runs in favor of the parent corporation. Moreover, any legally enforceable condition which prohibits the employee from disposing of his stock without the consent of the parent (or a subsidiary of the parent) will be considered to be a substantial limitation running in favor of the parent corporation.

created several subsidiary corporations, each of which owned and operated a store in a particular trade area. Employees of A, the various subsidiaries, and two other related firms were permitted to purchase 21 to 23 percent of each of the subsidiaries, with A owning the remainder. At the same time, A created another corporation, SC, to maintain a market for the stock held in the subsidiaries. The subsidiaries' stock was issued subject to a restriction giving SC a 30-day option in case the shareholder proposed to dispose of his stock or terminated his employment with A or a related firm. Concluding that A could *indirectly* maintain the same control over the ownership of the subsidiaries' stock as could a parent corporation in whose favor transfer restrictions ran *directly,* the court said (*Mid-America Industries, Inc. v. United States, supra* at 1033):

Section 1563(c)(2)(A)(iii) does not require that the conditions run *directly* in favor of the parent or subsidiary, but instead conditions which *indirectly* favor either the parent or subsidiary should also cause the stock to be excluded. See, Treas. Reg. sec. 1.1563-2(b)(2)(iii) (1965). A contrary position would, in our view, put form over substance. * * *

The court reasoned that, since the restrictions were imposed by the subsidiaries when the stock was issued, the parent through its control of the subsidiaries could alter the restrictions so that they no longer purported to run in favor of SC and could cause them to run in favor of a more amenable subsidiary. The court added (477 F.2d at 1032):

Similarly, in the event that an employee of either Automotive [A], or one of its subsidiaries, exercised his stock ownership rights contrary to the interests and desires of Automotive, Automotive could cause the termination of his employment and thereby force the sale of his stock. The advantage of Automotive's power was evident. Through it, Automotive could maintain ultimate control over the disposition of stock in the subsidiaries which is technically owned by outsiders. It was able to indirectly maintain the same control as can a parent corporation in whose favor transfer restrictions run directly. The latter arrangement is clearly denied full benefit of the multiple surtax exemptions and tax reduction by sections 1561—1563 of the Code, and we are of the view that the former indirect arrangement is as well.

True, in the instant case, the option to repurchase the employees' stock in petitioner-subsidiaries was imposed by CBI when it resold the stock, rather than by the petitioner-subsidiaries when they issued it, and in this respect the facts are different from those in the *Mid-America* case. But this is a difference in form rather than substance. As a "practical matter,"

*Mid-America Industries, Inc. v. United States, supra* at 1032, CBI was the handmaiden of Crow-Burlingame, and the option rights which nominally ran in favor of CBI indirectly favored Crow-Burlingame.

Crow-Burlingame's management caused CBI to be organized in 1959 as part of its general plan to incorporate its local stores. The declared objective in creating CBI was not to launch an independent investment program but to assist in making stock of Crow-Burlingame's local subsidiary corporations available to their key employees as a means of keeping competent personnel. Other than amounts invested in certificates of deposits and savings accounts, CBI had no assets except the stock it owned in the petitioner-subsidiaries and other Crow-Burlingame subsidiaries. Its whole reason for existence was to serve Crow-Burlingame in facilitating the local subsidiaries plan.

At all times since CBI was created, Crow-Burlingame has dominated its activities. The two corporations had the same president and vice president and the same attorneys. Two of three members of CBI's board of directors were also directors of Crow-Burlingame. The third member was Crow-Burlingame's auditor. Crow-Burlingame and CBI shared the same office space, office equipment, and clerical help. CBI did not market its stock in the petitioner-subsidiaries in the normal sense of the term. Rather the board of directors of a petitioner-subsidiary would decide whether and how many shares would be sold to an employee of that subsidiary, and CBI would then handle the sale from the shares it originally acquired in the subsidiary or from shares transferred to it by Crow-Burlingame for that purpose. In every one of the eight instances in which stock of one of the subsidiaries has become available under the option, CBI has reacquired the stock. None of this stock has been allowed to fall into the hands of outsiders.

In accordance with Crow-Burlingame's 1959 plan, all of CBI's sales of the petitioner-subsidiaries' stock have been made subject to a 30-day "option to re-purchase said stock in the event the said purchaser at any time desires to sell said stock, leave the employ of the Company for which he was working at the time of the purchase of the said stock, or in the event of the death of said purchaser." This option gave Crow-Burlingame a whiphand if needed in dealing with any recalcitrant employee-owner of shares in the petitioner-subsidiaries. Since Crow-Burlingame owned 71

to 78 percent of the petitioner-subsidiaries' stock, it could cause the termination of the services of any uncooperative employee-owner, thereby triggering CBI's option to repurchase the stock. *Mid-America Industries, Inc. v. United States, supra* at 1032. The fact that Crow-Burlingame has never been forced to discharge an employee in order to control his stock is beside the point. Crow-Burlingame had this whiphand power, and that was enough to give it the same benefits of control as it would have possessed if the stock had been owned outright.

Petitioners make the technical argument, however, that the repurchase options ran nominally in favor of CBI rather than Crow-Burlingame or the petitioner-subsidiaries. But Crow-Burlingame's dominance of CBI in the manner described above, as of December 31, 1970—indeed, from 1959 to the date of the trial—demonstrates that petitioner's point is truly a technical one and without merit. CBI's interests were inseparable from those of Crow-Burlingame's. Although the options *directly* favored CBI, they *indirectly* favored Crow-Burlingame. That is sufficient under section 1563(c)(2)(A)(iii). *Mid-America Industries, Inc. v. United States, supra* at 1033.

Petitioners next argue that CBI was an "unrelated" corporation and the option rights may not, therefore, be treated as favoring Crow-Burlingame because neither Crow-Burlingame nor the petitioner-subsidiaries owned CBI's stock. We think, however, that the record fairly shows that Crow-Burlingame indirectly controlled a substantial majority of CBI's stock. The president of Crow-Burlingame testified that from 1959 to 1974, CBI's 478 shares of stock were owned by individuals in three categories: (1) Employees of Crow-Burlingame's subsidiaries; (2) employees of Parts Warehouse; and (3) employees of Crow-Burlingame.

As to category (1), 57 shares were owned by employees of certain petitioner-subsidiaries and another subsidiary whose stock was subjected to the CBI repurchase option discussed above.[9] Another 66 shares were owned by local corporations

---

[9]

| Shareholder | Number of shares | Subsidiary |
| --- | --- | --- |
| Herbert Ragar | 25 | Warren |
| Clarence Allan | 20 | Hot Springs |
| R. W. Wetherington | 10 | Hot Springs |
| J. C. Dickey | 2 | England |

referred to as subsidiaries of Crow-Burlingame,[10] but the record does not expressly show that their stock was issued subject to the CBI repurchase option.

In the second category, 80 shares were owned by employees of Parts Warehouse.[11] That corporation was organized in 1958, and all of its stock, with the exception of two or three small amounts, was purchased by employees of Crow-Burlingame. Only in the event of death of a Parts Warehouse shareholder, however, did Parts Warehouse have an option to buy that shareholder's stock. The record does not show who owned Parts Warehouse stock on December 31, 1970.

Eliminating the 66 shares owned by employees of subsidiaries not shown to have been issued subject to the CBI repurchase option and the 80 shares owned by Parts Warehouse employees, together with 13 other nonemployee-owned shares,[12] there remain approximately 315 shares. We think it is a reasonable inference from the testimony that most, if not all, of these 315 shares, were in the third category, owned by Crow-Burlingame's employees. This is a substantial majority of the 478 outstanding shares. CBI issued all of its shares subject to a 30-day option to reacquire the shares in case, among other circumstances, the owner's employment with the company for which he was working on the date of the purchase of such shares was terminated. This option gave Crow-Burlingame the same kind of indirect control

---

[10]

| Shareholder | Number of shares | Subsidiary |
|---|---|---|
| J. B. Moore | 8 | Texarkana |
| Carl Fougerousse | 6 | Texarkana |
| Ottis Goodson | 10 | Texarkana |
| Fred Watts | 15 | Harrison |
| Dillon Seymore | 10 | Texarkana |
| Q. L. Barnes, Jr. | 2 | West Monroe |
| A. V. Buchanan | 7 | Prescott |
| Whitt Reeves | 8 | Marshall |

[11]

| Shareholder | Number of shares | Shareholder | Number of shares |
|---|---|---|---|
| Claude A. Hefley | 45 | Carl C. Mertens | 5 |
| L. L. Dickinson, Jr. | 19 | Charles Lankford | 5 |
| Lon Griffin | 3 | Wayne Tull | 3 |

[12] Mary Morton Smith was permitted to retain 4 shares after her husband died, and the Crow-Burlingame Employees Trust, which provided benefits for the employees of Crow-Burlingame, its subsidiaries, and Parts Warehouse, owned 9 shares. CBI had no employees as such.

of a majority of CBI's stock as it had over the stock owned by employees of the petitioner-subsidiaries.

There is no evidence that CBI ever took any action whatever which was inconsistent with what was believed to be Crow-Burlingame's best interests. Indeed, Crow-Burlingame's former president candidly testified that the stock repurchase options taken in the name of CBI have benefited both Crow-Burlingame and the petitioner-subsidiaries. He testified the repurchase options have kept the stock of the petitioner-subsidiaries from falling into the hands of individuals who are not employees, have assured a needed supply of petitioner-subsidiaries' stock for sale to employees, and have contributed to the stabilization of the employment pattern of the petitioner-subsidiaries. These benefits are as real as if the options had run directly in favor of Crow-Burlingame or one of the subsidiaries. The evidence clearly shows that on December 31, 1970, Crow-Burlingame enjoyed the same benefits from the CBI repurchase options as it would have if it had been the outright owner of the stock owned by employees of the petitioner-subsidiaries. *Mid-America Industries, Inc. v. United States, supra* at 1032; S. Rept. No. 830, *supra;* sec. 1.1563-2(b)(2)(iii), Income Tax Regs., quoted in footnote 8 above.

Petitioners contend, however, that a more technical interpretation should be given the excluded stock provisions of section 1563(c). They maintain that, for petitioners to constitute a "controlled group of corporations," Crow-Burlingame must be shown to have had a direct 80-percent control of the subsidiaries. This position, however, is contrary to the reasoning of *Mid-America Industries, Inc. v. United States, supra* at 1033, discussed above, and sec. 1.1563-2(b)(2)(iii), Income Tax Regs., quoted in footnote 8, *supra,* as well as the thrust of the above-cited explanation of the section in the Senate committee report which accompanied its enactment. Petitioners' position is also contrary to the following explanation of the excluded stock provisions in *Barton Naphtha Co.,* 56 T.C. 107, 116 (1971):

The exclusion of such stock is no more than a special refinement upon the 80-percent common ownership requirement designed to assure the denial of multiple surtax exemptions *where the common shareholder owns less than 80 percent of the stock but enjoys the prohibited degree of control as a result of restrictions applicable to the stock held by outsiders.* Given the presence of such control, we think that the statute mandates the denial of multiple exemptions for the same reasons generally applicable to controlled corporations, irrespective

of the absence of tax-avoidance motives. Any contrary interpretation of the statute would permit a shareholder possessing the prohibited degree of control to derive precisely the unwarranted benefits from multiple incorporation which the statute was intended to defeat. [Emphasis added.]

Had the statute been intended to require that the restrictions confer on the parent corporation 80-percent direct control of the subsidiaries, section 1563(c)(2)(A)(iii) more logically would have attributed ownership of the restricted stock to the parent corporation in the same manner as the statute does in the constructive ownership provisions of section 1563(e). Instead, the statute contemplates that stock burdened with restrictions which favor a parent will be treated as if it had not been issued provided that the parent has direct ownership of 50 percent (voting power or value) of the subsidiary's stock. Crow-Burlingame undisputably had the requisite direct ownership, and when the restricted stock is eliminated from consideration, it also had the requisite 80-percent ownership.

We hold that petitioners were a "controlled group of corporations" on December 31, 1970, and, consistent with their election, are subject to the additional surtax prescribed by section 1562.

*Decisions will be entered for the respondent.*