WILSON PLYWOOD AND DOOR, INC. (FORMERLY VENTURE SALES, INC.), et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Wilson Plywood & Door, Inc. v. Commissioner
Docket Nos. 11416-77; 1460-78, 1513-78; 1514-78.
United States Tax Court
T.C. Memo 1980-57; 1980 Tax Ct. Memo LEXIS 529; 39 T.C.M. (CCH) 1132; T.C.M. (RIA) 80057; February 28, 1980. *529 Anderson Wallace, Jr., for the petitioners. Richard D. Ames, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined the following deficiencies in petitioner corporations' income taxes for the fiscal years ending October 31, 1974, and October 31, 1975: Petitioner
Docket No.
F/Y/E
Deficiency [2] *530 Wilson Plywood and Door,
11416-77
10-31-74
$ 6,500.00
Inc. (formerly Venture
10-31-75
12,330.14
Sales, Inc.)
Inland Sales Co., Inc.
1460-78
10-31-74
4,333.42
10-31-75
8,220.26
Paint Sundries Co., Inc.
1513-78
10-31-74
1,470.34
10-31-75
990.99
Dallas Wholesale Builders
1514-78
10-31-74
4,333.16
Supply, Inc
10-31-75
8,219.77 The issue for decision is whether each petitioner corporation is entitled to a separate surtax exemption during each of the fiscal years ended October 31, 1974, and October 31, 1975, or whether the four corporations were component members of a controlled group limited to one surtax exemption under section 1561(a)(1), I.R.C. 1954. [3] Resolution of the issue presented depends on whether certain capital stock of three subsidiary corporations owned by their employees, which stock is subject to purchase options granted to the parent corporation, constitutes "excluded stock" within the meaning of section 1563(c)(2)(A)(iii) for the purpose of determining whether petitioner corporations form a parent-subsidiary controlled group. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. *531 [4] Dallas Wholesale Builders Supply, Inc. (Dallas Wholesale), was incorporated in Texas on March 1, 1955. It principal place of business at the time of filing its petition in this case was in Dallas, Texas. Dallas Wholesale timely filed its Federal income tax returns for fiscal years ending October 31, 1974, and October 31, 1975, with the Internal Revenue Service Center, Austin, Texas. Paint Sundries Company, Inc. (Paint Sundries), was incorporated in Texas. [5] *532 Its principal place of business at the time of filing its petition in this case was Dallas, Texas. Paint Sundries timely filed its Federal income tax returns for fiscal years ending October 31, 1974, and October 31, 1975, with the Internal Revenue Service Center, Austin, Texas. Inland Sales Company (Inland Sales) was incorporated in Texas on May 25, 1953. Its principal place of business at the time of filing its petition in this case was Dallas, Texas. Inland Sales timely filed its Federal income tax returns for fiscal years ending October 31, 1974, and October 31, 1975, with the Internal Revenue Service Center, Austin, Texas. Venture Sales, Inc. (Venture Sales) was incorporated in Texas. [6] *533 The corporate name subsequently changed to Wilson Plywood and Door, Inc. (Wilson Plywood). The principal place of business of Wilson Plywood at the time of filing its petition in this case was Dallas, Texas. Wilson Plywood timely filed its Federal income tax returns for fiscal years ending October 31, 1974, and October 31, 1975, with the Internal Revenue Service Center, Austin, Texas. Dallas Wholesale distributes lumber sundry items, including amongst others, plywood, screen doors, aluminum doors, roofing, and glass. This merchandise is sold directly to dealers and lumber yards. During the tax years in issue the outstanding capital stock of Dallas Wholesale totaled 204 shares. [7] Those shares were held by four shareholders in the following amounts: Number
Percentage
of
of Shares
Shareholders
Shares
Outstanding
J. R. Byford
124.8
61.18
Vernon E. Potter
55.2
27.06
Roy H. Dale
12.0
5.88
H. Hale
12.0
5.88
In the years following the tax years in issue, Mr. Potter acquired the majority ownership from Mr. Byford. During fiscal years ending October 31, 1974, *534 and October 31, 1975, the officers of Dallas Wholesale included: Name
Position
J. R. Byford
President
Vernon E. Potter
Vice President
Roy H. Dale
Treasurer
On July 15, 1969, Dallas Wholesale purchased from A. C. Utterback at least 81.7 percent of the outstanding capital stock of each Paint Sundries and Inland Sales. [8] At that time the board of directors of Paint Sundries had authorized the issuance of 10,000 shares of capital stock. Paint Sundries continued to operate its business of selling bulk packaged items, including plaster of paris and powdered goods, to commercial industrial maintenance accounts and Inland Sales. On July 15, 1969, 50,000 shares of Inland *535 Sales capital stock were authorized. After Dallas Wholesale purchased the capital stock of Inland Sales, the latter corporation remained a distributor of paint sundries, including the sale of such items as sandpaper, rollers, and cupboard brushes to lumberyards, hardware stores, and paint stores. Even after the July 15, 1969, stock purchase, Dallas Wholesale maintained its offices at a location different from that of Inland Sales and Paint Sundries. The latter two companies continued to operate out of adjacent facilities. On February 11, 1970, Dallas Wholesale sold for $4.08 per share 1,500 shares of the stock of Inland Sales to Marianna Ellsworth, and 1,000 shares of the capital stock of Inland Sales to Charles W. Fletcher. Mr. Fletcher paid for this stock with community property. Prior to 1970 Mr. Fletcher had been a shareholder of Inland Sales for approximately 14 years, during which time he had acquired 3,050 unrestricted shares of Inland Sales stock. Mr. Fletcher had been employed by the company since 1956. Ms. Ellsworth had been the bookkeeper for Inland Sales since approximately 1960, which position she retained in 1970 and the tax years here involved. In approximately *536 1970 Mr. Fletcher was elected president of Inland Sales, to which position he was reelected during each tax year in issue. During fiscal years ending October 31, 1974, and October 31, 1975, other Inland Sales officers were Vernon E. Potter, vice president, and J. R. Byford, chairman of the board. The February 11, 1970, stock ownership of Inland Sales remained essentially unchanged until 1978. During the tax years in issue, fiscal years ending October 31, 1974, and October 31, 1975, the capital stock of Inland Sales was owned as follows: Number of
Percentage
Shares
of Shares
Shareholders
Outstanding
Outstanding
Dallas Wholesale
38,350
76.7
Charles W. Fletcher
1,000
2.0
Marianna Ellsworth
1,500
3.0
Others
9,150
18.3
(including 3,050 unrestricted shares owned by
Charles W. Fletcher prior to February 11,
1970)
Unlike the 3,050 shares of Inland Sales capital stock owned by Mr. Fletcher prior to 1970, the 1,000 shares he purchased on February 11, 1970, are subject to a disposition restriction. The 1,500 shares of Inland Sales stock purchased by Ms. Ellsworth on February 11, 1970, are also subject to the same restriction. The stock certificates issued to each Mr. Flectcher and Ms. Ellsworth indicate by notation *537 that "The shares represented by this certificate are transferable only upon compliance with the terms of a contract dated of even date, executed by the above shareholder and Dallas Wholesale builders Supply, Inc." The terms of that shareholder agreement entitled Dallas Wholesale to exercise in certain circumstances a right of first refusal over the alienation of the Inland Sales stock owned by either Mr. Fletcher or Ms. Ellsworth. [9] *538 *539 *540 The events that trigger Dallas Wholesale's purchase option include: (1) either shareholder wishes to dispose of the stock; (2) either shareholder voluntarily or involuntarily ceases employment with Inland Sales; and (3) either shareholder dies. The agreement stipulates that the shares will be repurchased at the book value existing at the time of repurchase. In the years following the tax years in issue, Ms. Ellsworth approached Mr. Fletcher and offered to sell her 1,500 shares of Inland Sales stock to Mr. Fletcher. Mr. Fletcher accepted the offer. Thereafter Mr. Fletcher informed Mr. Potter, then the majority stockholder of Dallas Wholesale, of the prospective stock transfer. Mr. Fletcher offered to allow Mr. Potter to purchase a portion of Ms. Ellsowrth's Inland Sales stock, and Mr. Potter accepted. Therefore, the final purchase of Ms. Ellsworth's stock was split between Mr. Fletcher and Mr. Potter. On February 11, 1970, Dallas Wholesale sold 270 shares of Paint *541 Sundries capital stock to Mr. Fletcher at a price of $2.52 per share. [10] *542 At that time Mr. Fletcher was a salesman for Paint Sundries and had been a shareholder for approximately 15 years, during which time he had acquired 610 shares of Paint Sundries' unrestricted stock. However, all of those shares purchased on February 11, 1970, are restricted, as evidenced by the statement appearing upon the stock certificate: "The shares represented by this certificate are transferable only upon compliance with the terms of a contract dated of even date, executed by the above shareholder and Dallas Wholesale Builders Supply, Inc." That shareholder agreement, the same contract executed on February 11, 1970, by J. R. Byford for Dallas Wholesale, Mr. Fletcher, and Ms. Ellsworth, as referred to herein above, entitles Dallas Wholesale to exercise a right of first refusal over the disposition of the Paint Sundries stock held by Mr. Fletcher in the event of his death, voluntary or involuntary employment termination, or voluntary stock sale. (See footnote 9.) As of February 11, 1970, and during the tax years in issue, the Paint Sundries outstanding stock totaled 10,000 shares, owned by the shareholders as follows: Number of
Percentage
Shares
of Shares
Shareholders
Outstanding
Outstanding [11]
Dallas Wholesale
7,900
79
Charles W. Fletcher
270
2.70
Others
1,825
18.25
(including 610 unrestricted shares owned by
Mr. Fletcher prior to February 11, 1970)
During the tax years in issue the corporate officers of Paint Sundries included Charles W. Fletcher, president, Vernon E. Potter, executive vice president, and J. R. Byford, chairman of the board. During the years in issue Messrs. Byford and Potter consulted with Mr. Fletcher in his planning for the operations of both Inland Sales and Paint *543 Sundries. To inform all interested parties of the problems and progress of Inland Sales and Paint Sundries, these consultations occurred on a weekly or bi-weekly basis. On July 1, 1973, Dallas Wholesale owned 100 percent of the outstanding capital stock of Venture Sales, which subsequently, changed its name to Wilson Plywood. In 1973 and during the tax years in issue, Wilson Plywood was in the business of selling home interior packages, including ready-hung door units, plywood, lumber, screen wire, and nails, to home builders and contractors. Wilson Plywood has continuously operated from a facility separate from that of Dallas Wholesale, Inland Sales and Paint Sundries. On or about July 11, 1973, Dallas Wholesale sold 2,400 shares of Wilson Plywood stock to each Ronald L. Davis and James M. Preddy, employees of Wilson Plywood. [12] *545 As specified in a shareholder agreement executed on July 11, 1973, by Mr. Davis, Mr. Preddy, and Mr. Potter for Dallas Wholesale, restrictions were placed upon the disposition of a majority of the Wilson Plywood stock. That shareholder agreement restricts the sale of 2,400 shares of Wilson Plywood stock owned by Mr. Preddy, 2,400 shares of Wilson Plywood *544 stock owned by Mr. Davis, and 5,100 shares of stock owned by Dallas Wholesale. [13] *546 *547 *548 *549 *550 Specifically, the contract provides that if either Mr. Preddy or Mr. Davis desires to sell his Wilson Plywood stock, dies, or terminates his employment with Wilson Plywood, the stock must first be offered for sale to the other individual shareholder. Dallas Wholesale is given the second option to purchase the Wilson Plywood stock, which is exercisable if the first right of refusal is not employed. In the event that Dallas Wholesale desires to sell its Wilson Plywood capital stock, each Mr. Davis and Mr. Preddy individually have the right of first refusal to one-half of any of the 5,100 shares of Wilson Plywood stock offered for sale by Dallas Wholesale. The corporate by-laws of Wilson Plywood capsulize the stock restriction in Article XII which in pertinent part specifies: ARTICLE XII
RESTRICTIONS ON SALE AND/OR TRANSFER OF SHARES OF STOCK
Section 1. The original subscribers of stock in the corporation *551 are as follows: Authorized Shares:
10,000 with par value of $1.00
per share.
Shares Issued
Ronald L. Davis - 2400 shares
James M. Preddy - 2400 shares
Dallas Wholesale Builders Supply, Inc. 5,100 shares Unissued Shares: 100 Shares Section 2. With the exception of the 100 unissued shares, the sale of which shall be the responsibility of the Board of Directors, the sale and/or transfer of shares of stock of the corporation may be made only upon compliance with an agreement executed by the original shareholders, wherein Ronald L. Davis has granted unto James M. Preddy the fist option to purchase his stock and thereafter a second option to Dallas Wholesale Builders Supply, Inc., and wherein James M. Preddy has granted unto Ronald L. Davis the first option to purchase his stock and thereafter a second option to Dallas Wholesale Builders Supply, Inc., and wherein Dallas Wholesale Builders Supply, Inc. has granted unto Ronald L. Davis and James M. Preddy jointly the option to purchase its stock, in the event such shall be offered for sale, such options also to come into consideration in the event of the death of either of the individual stockholders, all as set out in said contract, copy of which *552 is hereunto attached. A notation on stock certificates, dated October 4, 1973, issued to each Mr. Davis and Mr. Preddy for 2,200 shares of Venture Sales, Inc. capital stock evidences the above-stated alienation restriction. The stock certificate notations state in full: "This stock is transferable only upon compliance with Article XII of the By-Laws of the Corporation, and with Stockholders Agreement, dated July 11, 1973." During the tax years in issue, the Wilson Plywood stock issued and outstanding totaled 10,000 shares, with stock ownership as follows: Number of
Percentage
Shares
of Shares
Shareholders
Outstand
Outstanding
Dallas Wholesale
5,100
51
Ronald L. Davis
2,450
24.5
(at least 2400 shares subject to restriction
as stated in July 11, 1973, shareholder
agreement)
James M. Preddy
2,450
24.5
(at least 2,400 shares subject to restriction as stated in July 11, 1973, shareholder
agreement) During the same years Mr. Davis and Mr. Preddy were employees and officers of Wilson Plywood, president and vice president, respectively. Mr. Davis and Mr. Preddy each earned a salary from Wilson Plywood of $41,700 in 1974 and $87,000 in 1975. In 1977 and 1978 Dallas Wholesale sold its stock holdings in Wilson *553 Plywood, Inland Sales, and Paint Sundries as follows: Wilson Plywood Capital Stock
Date
Number of
New
Sold
Shares Sold
Shareholder
10/27/77
200
Vernon Potter
10/11/78
1,634
Bryon E. Potter Trust
10/11/78
1,633
Carla Diane Potter Trust [14]
10/11/78
1,633
Pamela Denise Hill Trust [15]
Inland Sales Capital Stock
Date
Number of
New
Sold
Shares Sold
Shareholder
10/11/78
8,250
Bryon E. Potter Trust
10/11/78
8,250
Carla Diane Potter Trust
10/11/78
8,250
Pamela Denise Hill Trust
10/11/78
13,600
Charles W. Fletcher
Paint Sundries Capital Stock
Date
Number of
New
Sold
Shares Sold
Shareholder
10/11/78
1,599
Bryon E. Potter Trust
10/11/78
1,598
Carla Diane Potter Trust
10/11/78
1,598
Pamela Denise Hill Trust
10/11/78
3,105
Charles W. Flectcher After the above 1977 and 1978 sales transactions, Dallas Wholesale did not retain a stock interest in Wilson Plywood, Paint Sundries, and Inland Sales. Each of the petitioners filed separate Federal income tax returns for fiscal years ending October 31, 1974, and October 31, 1975. For both fiscal years each of the four corporations claimed a section 11(d) surtax exemption as follows: Fiscal year
Amount Surtax
Corporation
Ending
Exemption Claimed
Dallas Wholesale
10/31/74
$25,000.00
Dallas Wholesale
10/31/75
25,000.00
Paint Sundries
10/31/74
13,988.17
Paint Sundries
10/31/75
18,437.50
Inland Sales
10/31/74
25,000.00
Inland Sales
10/31/75
25,000.00
Wilson Plywood
10/31/74
25,000.00
Wilson Plywood
10/31/75
25,000.00
Respondent *554 disallowed the multiple surtax exemptions claimed by petitioners and explained with regard to Dallas Wholesale, Paint Sundries, and Inland Sales: You're a component member of a controlled group of corporations as described in section 1563 of the Internal Revenue Code. The Component members of controlled corporations did not consent to an apportionment plan as provided in section 1561 of the Code; accordingly, the surtax exemption is apportioned as provided in section 1561. Therefore, respondent allocated the $25,000 allowed surtax exemption as follows: Surtax
Fiscal Year
Exemption
Corporation
Ending
Allowed
Dallas Wholesale
10/31/74
$8,334
Dallas Wholesale
10/31/75
8,334
Paint Sundries
10/31/74
8,333
Paint Sundries
10/31/75
8,333
Inland Sales
10/31/74
8,333
Inland Sales
10/31/75
8,333
With regard to Wilson Plywood respondent indicated that "It is determined that the claimed surtax exemption is not allowable for the years ended October 31, 1974 and October 31, 1975 because your applicable portion if any, has not been established." Consequently, respondent did not apportion any part of the available surtax exemption to Wilson Plywood. [16]
OPINION *555 Section 1561(a)(1) limits a group of corporations which constitute "a controlled group of corporations" on December 31, to one surtax exemption apportioned equally amongst them or in accordance with an apportionment plan. [17] *556 A "controlled group of corporations" is defined in section 1563(a)(1) to include a chain of corporations having a common parent corporation where the parent owns at least 80 percent of the total voting power of stock of each subsidiary or at least 80 percent of the total value of stock of each subsidiary. [18] *557 For purposes of determining the 80 percent ownership certain stock of the subsidiary corporation is "excluded" and treated as not outstanding. One category of this "excluded stock" is defined in section 1563(c)(2)(A)(iii). [19] *558 The exclusion occurs where the parent corporation owns 50 percent or more of a subsidiary corporation's capital stock, and a portion of the remaining stock of the subsidiary is owned by its employees where the employees' shares are subject to "conditions which run in favor of such parent (or subsidiary) corporation" and substantially restrict or limit the employees' right to dispose of the stock. The issue for decision is whether certain capital stock of three subsidiary corporation owned by employees of those subsidiaries, which stock is subject to purchase options granted to the parent corporation, is "excluded stock" within the meaning of section 1563(c)(2)(A)(iii). The parties here concede that if the employees' shares constitute "excluded stock," then *559 the parent corporation meets the 80 percent ownership test of section 1563(a)(1), and the chain of corporations is a "controlled group of corporations." That classification would reduce to one exemption the total number of surtax exemptions available to the corporations under section 1561(a)(1). Accordingly, the one exemption would be partitioned equally amongst the component members of the controlled group unless a plan is devised to apportion the surtax otherwise. [20] However, if the subject stock is not "excluded stock," then the parent company does not meet the 80 percent ownership test of section 1563(a)(1), and each corporation would be entitled to a separate surtax exemption. Dallas Wholesale, incorporated in Texas on March 1, 1955, is a distributor of lumber sundry items, including plywood, screen doors, aluminum doors, roofing, *560 and glass, and it sells to dealers and lumber-yards. It operates on a fiscal year basis with its fiscal year ending on October 31. During the tax years in issue, fiscal years ending October 31, 1974, and October 31, 1975, the stock ownership of Dallas Wholesale was as follows: Number
Percentage
of
of Shares
Shareholders
Shares
Outstanding
J. R. Byford
124.8
61.18
Vernon E. Potter
55.2
27.06
Roy H. Dale
12.0
5.88
H. Hale
12.0
5.88
Throughout the same period the officers elected annually to Dallas Wholesale were J. R. Byford, president, Vernon E. Potter, vice president, and Roy H. Dale, treasurer. During the tax years in question Dallas Wholesale owned a substantial portion of stock in three corporations--Inland Sales, Paint Sundries, and Wilson Plywood. Inland Sales, incorporated in Texas on May 25, 1953, is a distributor of paint sundries, including sandpaper, rollers, and covered brushes, and it sells to lumberyards, hardware stores, and paint stores. Dallas Wholesale purchased at least 81.7 percent of all of the 50,000 shares of outstanding capital stock of Inland Sales on July 15, 1969. (See footnote 5.) Subsequently, on February 11, 1970, Dallas Wholesale sold 1,000 shares of the capital stock *561 of Inland Sales to Mr. Fletcher and 1,500 shares to Ms. Ellsworth. In 1970 both Mr. Fletcher and Ms. Ellsworth were employees of Inland Sales. On February 11, 1970, J. R. Byford for Dallas Wholesale, Mr. Fletcher and Ms. Ellsworth executed a shareholder agreement with regard to the stock purchased by each individual on that day. The agreement grants Dallas Wholesale a right of first refusal if either Mr. Fletcher or Ms. Ellsworth decides to dispose of that stock. Moreover, Dallas Wholesale has the first right to acquire the employees' stock if the employment of either Mr. Fletcher or Ms. Ellsworth is voluntarily or involuntarily terminated. Dallas Wholesale's right of first refusal also extends to the event of sale upon the death of either Mr. Fletcher or Ms. Ellsworth. The agreement further provides that if the majority shareholder, Dallas Wholesale, sells its Inland Sales capital stock to a third party, Mr. Fletcher and Ms. Ellsworth will convey their shares to the same purchaser. (See footnote 9 for text of the February 11, 1970, shareholder agreement.) Throughout the tax years in question Ms. Ellsworth was Inland Sales' bookkeeper. Mr. Fletcher was annually elected the corporation's *562 president. The other Inland Sales officers were J. R. Byford, chairman of the board, and Vernon E. Potter, vice president. During fiscal years ending October 31, 1974, and October 31, 1975, the stock ownership of Inland Sales was as follows: Number of
Percentage
Shares
of Shares
Shareholders
Outstanding
Outstanding
Dallas Wholesale
38,350
76.7
Charles W. Fletcher
1,000
2.0
Marianna Ellsworth
1,500
3.0
Others
9,150
18.3
(including 3,050 unrestricted shares owned
by Charles W. Fletcher prior to February 11,
1970)
Paint Sundries, a seller of bulk packaged items to lumberyards and Inland Sales, was incorporated in Texas. On July 15, 1969, Dallas Wholesale purchased at least 81.75 percent of the capital stock outstanding of Paint Sundries. On February 11, 1970, Dallas Wholesale sold 270 shares of the capital stock of Paint Sundries to Mr. Fletcher, then a salesman for Paint Sundries. Those 270 shares were restricted in the same manner and by the same shareholder agreement as the Inland Sales capital stock purchased by Mr. Fletcher and Ms. Ellsworth on February 11, 1970. (See footnote 9 for text of February 11, 1970, shareholder agreement.) As with the stock certificates issued to Ms. Ellsworth and Mr. Fletcher *563 with regard to their February 11, 1970, purchase of Inland Sales capital stock, the stock certificate issued to Mr. Fletcher with regard to the 270 shares of Paint Sundries stock states: "The shares represented by this certificate are transferable only upon compliance with the terms of a contract dated of even date, executed by the above shareholder and Dallas Wholesale Builders Supply, Inc." During fiscal years ending October 31, 1974, and October 31, 1975, Mr. Fletcher was annually elected president of Paint Sundries. J. R. Byford acted as chairman of the board, and Vernon E. Potter was the executive vice president. At that time, the stock ownership of Paint Sundries was as follows: Number of
Percentage
Shares
of Shares
Shareholders
Outstanding
Outstanding
Dallas Wholesale
7,900
79
Charles W. Fletcher
270
2.70
Others
1,825
18.25
(including 610 unrestricted shares owned
by Mr. Fletcher prior to February 11,
1970) Petitioner contends that the capital stock of Inland Sales and Paint Sundries acquired by Mr. Fletcher and Ms Ellsworth on February 11, 1970, does not constitute "excluded stock" within the meaning of section 1563(c)(2)(A)(iii). While conceding that the literal terms of the February 11, 1970, *564 shareholder agreement entitles Dallas Wholesale to a right of first refusal on any transfer of Inland Sales or Paint Sundries capital stock by Mr. Fletcher or Ms. Ellsworth, [21] petitioners argue that the restrictions do not substantially limit or restrict either employee's right or ability to alienate the shares. Petitioners focus on what they contend to be the purpose and intent of the shareholder agreement--" to protect Inland Sales and Paint Sundries from shareholder disputes generated by domestic problems between stockholders and their spouses." [22] *565 *566 At trial petitioners' witness indicated that the corporations did not want divorcees to sell their stock to outsiders who "could cause a bunch of problems--unnecessary problems in the everyday operations of the company." According to petitioners, the declared intention was to give other employees, rather than the employer or Dallas Wholesale, absolute control over the eventual disposition of an employee's stock. S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964-1 (Part 2) C.B. 505, 655 and H. Rept. No. 749, 88th Cong., 1st *567 Sess. (1963), 1964-1 (Part 2) C.B. 125, 243, express the purpose of reducing the number of available surtax exemptions in the case of certain controlled corporations as: * * * certain outstanding stock, although owned by separate persons, could, unless neutralized for purposes of determining control, be used by some owners as a means of divesting themselves of sufficient stock to avoid the application of this section without, as a practical matter, divesting themselves of the benefits of ownership of a corporation. That language plainly indicates that the denial of multiple surtax exemptions is based upon the actual control over the disposition of an employee's stock as retained by the parent or subsidiary corporation. In Barton Naphtha Co. v. Commissioner,56 T.C. 107 (1971), a case concerned with a brother-sister group of corporations, the taxpayer unsuccessfully argued that multiple surtax exemptions should be allowed where the issuance of restricted stock to employees was motivated by legitimate business reasons rather than by a tax avoidance decision. In discounting the taxpayer's contention, the Court reasoned that the-- * * * present statute * * * establishes objective criteria *568 based solely upon the presence of the requisite degree of common control. Any doubt as to the proposition that tax-avoidance motives are irrelevant to the operation of section 1561 et seq. is eliminated by the committee reports * * *. [Id. at 116.] It is clear that the declared intention or purpose of a restrictive provision does not control a determination of whether the stock restriction substantially restricts or limits the employees' right to dispose of the shares. The rein of control is the sole concern of the statute. Id. at 117; Mid-America Industries, Inc. v. United States,477 F.2d 1029, 1033 (8th Cir. 1973). Petitioners contend that Congress would not have intended that they be denied multiple surtax exemptions. Petitioners point to language found in the House of Representatives and Senate reports to support this argument: "While the House and your committee recognize the advantages of use of multiple corporations, it is believed, as it has been in the past, that, where corporations owned and controlled by the same interests engage in different businesses in the same area or conduct the same type business in different geographical locales, there are legitimate business *569 reasons for use of separate corporations and, therefore, the separate corporations should generally be recognized as separate taxpayers, retaining the benefit of use of multiple surtax exemptions. H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964-1 (Part 2) C.B. 125, 242; S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964-1 (Part 2) C.B. 505, 653-654. Those same reports express that Congress did not intend to encourage medium and large enterprises to form multiple corporations. While each corporation here is actively engaged in business, the entwined relationships amongst the chain's members with regard to the type of business operations and functions, the overlap of corporate officers and board members, and the corporations' sizes persuade us that Congress intended the corporations not to benefit from the use of multiple surtax exemptions. Petitioners further argue that it is significant that Ms. Ellsworth sold her 1,500 shares of restricted shares of Inland Sales stock after the tax years in issue by directly approaching Mr. Fletcher with an offer to sell without any formal release from Dallas Wholesale as to its first right of refusal under the February 11, 1970, shareholder *570 agreement. Petitioners indicate that Mr. Fletcher readily agreed to buy Mr. Ellsworth's stock, and that he in turn told Mr. Potter (who we assume at that time was the majority shareholder of Dallas Wholesale) of the anticipated transaction. Mr. Fletcher offered to divide with Mr. Potter the Inland Sales stock then held by Ms. Ellsworth. On brief petitioners summarize their position: "The 'substance' of the Dallas Wholesale Agreement, as opposed to its 'form,' was clearly to allow the sale of shares subject to its restrictions to other employees of either Inland Sales or Paint Sundries." Petitioners' reliance on the stock transaction between Ms. Ellsworth and Messrs. Fletcher and Potter is misplaced. The record indicates that Mr. Fletcher was president of Inland Sales at the time Ms. Ellsworth approached him to sell the stock. Under Texas law, notice concerning a corporate matter, here an offer, submitted to a corporation's president or other appropriate officer is notice to the corporation itself. E.g., Phillips v. Hopwood,329 S.W.2d 452, 455 (Tex. Civ. App. 1959). Consequently, we conclude that when Mr. Fletcher gave notice to Mr. Potter, an officer and the majority stockholder *571 of Dallas Wholesale, notice was given to Dallas Wholesale. We are of the opinion that Ms. Ellsworth disposed of her stock in accordance with the February 11, 1970, shareholder agreement which entitled Dallas Wholesale to a significant right of first refusal. Respondent convincingly argues that the February 11, 1970, restrictive stock agreement provides Dallas Wholesale with a means of reacquiring all restricted stock owned by the employees of Inland Sales and Paint Sundries. The agreement provides that the voluntary or involuntary termination of employment of either Mr. Fletcher or Ms. Ellsworth triggers the Dallas Wholesale option to repurchase the stock of the former employee at the then book value. (See terms of February 11, 1970, shareholder agreement in footnote 9.) Respondent indicates that the ability of a parent corporation to summarily cause the dismissal of a subsidiary's employee and to reacquire his corporate stock essentially forces the employee into the status of a marionette. On the other hand, petitioners argue that the board of directors' fiduciary duty would prevent the firing of corporate officers without cause. They reason that the overall effect of the restriction *572 is thereby nullified, thus forcing the restriction into the category of insubstantiality. Petitioners' argument cannot succeed. In Texas while the board of directors is subject to a fiduciary duty, officers of the corporation "may be removed by the board of directors whenever in its judgment the best interests of the corporation will be served thereby." (Emphasis added.) Tex. Bus. Corp. Act. Ann. art. 2.43 (Vernon). That provision allows a board of directors to remove a corporate officer without its violating its fiduciary duty. In the instant case, it is conceivable that the board of directors might decide in the best interests of the corporation to remove Mr. Fletcher from his position as president and replace him with another person. In accordance with the shareholder agreement that act would force Mr. Fletcher to offer his stock for sale to Dallas Wholesale.
The power to terminate an employee and to force the sale of his stock to the subsidiary or parent corporation is tantamount to the control with which Congress was concerned in enacting sections 1561 through 1563. As we indicated in Crow-Burlingame Co. of Pine Bluff v. Commissioner,65 T.C. 785, 797 (1976), affd. 547 F.2d 1173 (8th Cir. 1976), *573 the substantiality of the stock restriction is not based on whether the corporation ever took such actions, but rather upon the rights reserved to the corporation, albeit unexercised. While section 1563(c)(2)(A)(iii) does not define "substantially restrict or limit," section 1.1563-2(b)(2)(iii), Income Tax Regs., which has been quoted with approval by this Court and others, states: (iii) Employees. Stock in the subsidiary corporation owned (directly and with the application of the rules contained in paragraph (b) of section 1.1563-3) by an employee of the subsidiary corporation if such stock is subject to conditions which substantially restrict or limit the employee's right (or if the employee constructively owns such stock, the direct owner's right) to dispose of such stock and which run in favor of the parent or subsidiary corporation. In general, any condition which extends, directly or indirectly, to the parent corporation or the subsidiary corporation preferential rights with respect to the acquisition of the employee's (or direct owner's) stock will be considered to be a condition described in the preceding sentence. It is not necessary, in order for a condition to be considered *574 to be in favor of the parent corporation or the subsidiary corporation, that the parent or subsidiary be extended a discriminatory concession with respect to the price of the stock. For example, a condition whereby the parent corporation is given a right of first refusal with respect to any stock of the subsidiary corporation offered by an employee for sale is a condition which substantially restricts or limits the employee's right to dispose of such stock and runs in favor of the parent corporation. Moreover, any legally enforceable condition which prohibits the employee from disposing of his stock without the consent of the parent (or a subsidiary of the parent) will be considered to be a substantial limitation running in favor of the parent corporation. This Court in Barton Naptha Co. v. Commissioner,56 T.C. 107, 117 (1971), stated guidelines on which to focus in determining whether a restriction is substantial: * * * It is plainly the use of substantial restrictions as a method of retaining the reins of corporate control which is the sole concern of the statute. Accordingly, in determining what constitutes a substantial restriction, the focus of inquiry is properly upon the *575 rights reserved to the common shareholder (or corporation) rather than the contraction of the employee's incidents of ownership. * * * Based upon those guidelines and the evidence before us, we conclude that the 1,000 shares of restricted stock of Inland Sales owned by Mr. Fletcher, the 1,500 shares of restricted capital stock of Inland Sales owned by Ms. Ellsworth, and the 270 shares of restricted capital stock of Paint Sundries owned by Mr. Fletcher are "excluded stock" within the meaning of section 1563(c)(2)(A)(iii).
Wilson Plywood, a manufacturer and seller of interior house packages, including hung door units, plywood, lumber, screen wire, and nails, was incorporated in Texas under the name of Venture Sales, Inc. Subsequently the name of Venture Sales was changed to Wilson Plywood. On July 1, 1973, Dallas Wholesale owned 100 percent of the outstanding capital stock of Wilson Plywood. On or about July 11, 1973, Dallas Wholesale sold a minority share of its Wilson Plywood stock to Ronald L. Davis and James M. Preddy, employees of Wilson Plywood. The stock transfer is evidenced by two stock certificates dated October 4, 1973, each for 2,200 shares, issued in the names of Mr. Davis *576 and Mr. Preddy. The notation on the stock certificates refers to a restriction upon transfer of the shares, and states: "This stock is transferable only upon compliance with Article XII of the By-Laws of the Corporation, and with Stockholders Agreement, dated July 11, 1973." The July 11, 1973, shareholder agreement provides that if either Mr. Preddy or Mr. Davis desires to sell any portion of his Wilson Plywood stock, upon death, or upon employment termination, the Wilson Plywood stock must first be offered for sale to the other individual. If that option of first refusal is not exercised, Dallas Wholesale may exercise its second right of refusal and purchase the Wilson Plywood stock. In the event that Dallas Wholesale desires to sell its shares of Wilson Plywood capital stock, Mr. Davis and Mr. Preddy individually have the right of first refusal to one-half of any of the shares offered. (See footnote 13 for text of July 11, 1973, shareholder agreement.) During the tax years in issue, fiscal years ending October 31, 1974, and October 31, 1975, the stock ownership of Wilson Plywood was as follows: Number
Percentage
of Shares
of Shares
Shareholders
Outstanding
Outstanding
Dallas Wholesale
5,100
51
Ronald L. Davis
2,450
24.5
(at least 2,400 shares subject to restriction
as stated in July 11, 1973, shareholder agree-
ment)
James M. Preddy
2,450
24.5
(at least 2,400 shares subject to restriction
as stated in July 11, 1973, shareholder agree-
ment)
Throughout *577 those years Mr. Davis was elected president, and Mr. Preddy was vice president of Wilson Plywood.
Petitioners argue that because the restriction on the Wilson Plywood stock owned by Mr. Davis and Mr. Preddy grants Dallas Wholesale a right of second refusal over the disposition of the employees' stock, rather than a right of first refusal, the stock is not "excluded stock" within the meaning of section 1563(c)(2)(A)(iii). Petitioners contend that the right of second refusal does not run in favor of a parent corporation and is not a substantial restriction on the employees' rights to dispose of their shares. For support they direct our attention to the language of the section 1.1563-2(b)(2)(iii), Income Tax Regs., which lists as its sole example of a substantial restriction the grant of a first right of refusal to a parent corporation. Petitioners further point out that the only cases concerned with similarly restricted stock are those where the corporation has a first right of refusal. These arguments do not persuade us that a second right of refusal cannot fall within the perimeters of section 1563(c)(2)(A)(iii). The cases concerned with the relevant statute certainly do not preclude *578 the possibility of the existence of other forms of stock restrictions which would trigger the application of section 1563(c)(2)(A)(iii). [23] Moreover, the cited Income Tax Regulation presents only one illustration of a condition which substantially restricts an employee's right to dispose of his stock, which restriction runs in favor of the parent corporation. The language of section 1.1563-2(b)(2)(iii), Income Tax Regs., does not eliminate the possibility that a second right of refusal constitutes a substantial limitation running in favor of the parent corporation. Petitioners argue that Mr. *579 Preddy and Mr. Davis hold the reins of control over one another's disposition of Wilson Plywood capital stock and that Dallas Wholesale does not even command indirect control over stock alienation. On the other hand respondent asserts that in all practical respects it is Dallas Wholesale that wields the control. An examination of the restrictions in issue generates several factual patterns. Construing paragraphs VI and VII of the July 11, 1973, shareholder agreement, if Mr. Preddy were to die a Wilson Plywood shareholder, Mr. Davis would have the right of first purchase. Assuming that Mr. Davis chooses not to exercise that right, under the July 11, 1973, shareholder agreement Dallas Wholesale's right to purchase Mr. Preddy's shares would arise spontaneously. That automatic right would then endow Dallas Wholesale with the power to control the disposal of the shares in question. Dallas Wholesale could alone determine whether it would retain the stock or allow it to be offered to third party outsiders. On the other hand, if Mr. Davis exercised his right of first refusal, he would acquire the shares subject to the restrictions attached thereto. As a result of Mr. Preddy's death *580 and Mr. Davis' exercise of his purchase option, the shares acquired from Mr. Preddy's estate in addition to Mr. Davis' own shares of Wilson plywood would automatically accelerate Dallas Wholesale's right of second refusal into a right of first refusal over the entire package of stock. The equivalent result would occur if Mr. Davis and Mr. Preddy exchanged positions in the factual pattern. The above sequence indicates that petitioners would have form prevail over substance. The soliloquy illustrates that the shareholder agreement grants Dallas Wholesale direct control over the Wilson Plywood stock as well as indirect control. The courts have consistently held that such indirect control is sufficient to trigger the "run in favor of such parent * * * corporation" clause of section 1563(c)(2) (A)(iii). Mid-America Industries, Inc. v. United States,477 F.2d 1029, 1033 (8th Cir. 1973); Crow-Burlingame Co. of Pine Bluff v. Commissioner,65 T.C. 785 (1976), affd. 547 F.2d 1173 (8th Cir. 1976). See also section 1.1563-2(b)(2)(iii), Income Tax Regs.
Moreover, in the factual pattern the conditions created in the shareholder agreement substantially restrict the employees' rights to dispose *581 of their Wilson Plywood stock. Because Dallas Wholesale has reserved ultimate exclusive control over the alienation of the shares of Mr. Preddy and Mr. Davis, Dallas Wholesale has an absolute method of preventing outsiders from acquiring the Wilson Plywood stock. Section 1.1563-2(b)(2)(iii), Income Tax Regs., regards either "preferential rights with respect to the acquisition of the employee's * * * stock" or an "enforceable condition which prohibits the employee from disposing of his stock without the consent of the parent" as a substantial restriction on the shares' alienation. In this instance, both aspects are present. Although in form the restriction is a second right of refusal, the substance represents the type of control contemplated by Congress when it enacted sections 1561 through 1563. Two other events which trigger the application of the July 11, 1973, shareholder agreement are an offer of purchase and employment termination. In construing the literal terms of paragraph IV of that document, if Mr. Davis terminates his employment with Wilson Plywood or desires to sell his stock, Mr. Preddy has the first option to purchase all of Mr. Davis' shares at the then existing *582 book value or the offer price respectively. Assuming that Mr. Preddy does not exercise his right of first refusal, Dallas Wholesale automatically has the option of exercising its right of second refusal. As above discussed, that right of second refusal which prohibits the employee from disposing of his stock without the consent of Dallas Wholesale is a substantial restriction on the shares' alienation which runs in favor of the parent corporation. In case Mr. Davis has an offer of purchase of all his stock and Mr. Preddy exercises his right of first refusal of that stock, Mr. Preddy would then own 49 percent of the Wilson Plywood stock. Under the rules of strict construction, Mr. Davis remains in the picture, albeit not as a shareholder. If Mr. Preddy later either desires to sell his shares or terminates his employment, a narrow construction of paragraphs I, II, IV, and V indicates that Mr. Preddy would be required to first offer his shares to Mr. Davis. Assuming Mr. Davis chooses to exercise his right of first refusal, he would purchase all of Mr. Preddy's shares, and Mr. Preddy would no longer be a shareholder. (See footnote 13 for text of paragraphs I, II, IV, and V.) Theoretically *583 it would be possible for those events to rotate between Mr. Preddy and Mr. Davis adinfinitum, with Dallas Wholesale continuing to possess a right of second refusal. In our view such a restricted right of transfer between the two employees of Wilson Plywood, if it exists, does not cause the restriction in favor of Dallas Wholesale not to be a substantial restriction. Furthermore, as hereinafter discussed, the agreement is a "shareholders" agreement, and it is unlikely that it would be interpreted to allow this situation. It might be argued that the above back and forth exchange could occur under the contract even though the selling shareholder ceased to be an employee of Wilson Plywood. In our view, no such interpretation of the contract is proper. The contract in paragraph IV specifically provides the only circumstances under which Mr. Davis can retain ownership of stock after ceasing to be an employee of Wilson Plywood. (See footnote 13.) The conditions required are that Mr. Preddy and Dallas Wholesale both refuse to purchase his stock for its book value. Certainly, if he could not retain stock except when Dallas Wholesale refuses to exercise its option to purchase it, he could *584 not under the contract acquire stock from Mr. Preddy after he has ceased to be an employee except as any other outsider could acquire it. This of course is after Dallas Wholesale has refused purchase of the stock. Any other interpretation of the contract would make the provisions of paragraph IV meaningless. At the time that the shareholder agreement was executed, Mr. Davis, Mr. Preddy, and Dallas Wholesale intended that the right of first refusal would vest only in an individual who is a shareholder-employee. Not only does general business practice dictate this interpretation, but the introductory language of the shareholder agreement points to this result. That contract provision states: WHEREAS, said stockholders are desirous of entering into a contract with reference to the shares of stock owned by them, granting unto one or the other certain options to purchase stock under the terms and conditions as hereinafter set out; * * *. It is clear that the parties intended the agreement to grant unto one or the other shareholder certain options to purchase stock. The appropriate reading of the shareholder agreement would cause an individual shareholder who either voluntarily alienates *585 all of his stock to the other individual shareholder or who voluntarily or involuntarily terminates his employment to completely lose his option rights under the July 11, 1973, shareholder agreement. Spontaneously, Dallas Wholesale's second right of refusal would escalate to the position of a first right of refusal over 49 percent of the Wilson Plywood stock. As above discussed, where Dallas Wholesale has reserved a second right of refusal in form, but retains direct as well as indirect control over the Wilson Plywood stock, we cannot allow form to obscure the substance. In our view, Dallas Wholesale attempted to divest itself or sufficient stock to avoid the application of section 1563(c)(2)(A)(iii). However, the above factors indicate that Dallas Wholesale retained the benefit of ownership with respect to Wilson Plywood, Inland Sales, and Paint Sundries. Accordingly, Decision will be entered for the respondent . Footnotes
1. Cases of the following petitioners are consolidated herewith: Inland Sales Company, Inc., docket No. 1460-78; Paint Sundries Company, Inc., docket No. 1513-78; and Dallas Wholesale Builders Supply, Inc., docket No. 1514-78.↩
2. On June 12, 1979, subsequent to the trial of this case, respondent filed a Motion for Leave to File Amendment to Answer to Conform to Proof based on a revised allocation of the allowed $25,000 surtax exemption. The revision affected the assessed deficiencies as follows: Petitioner
Docket No.
F/Y/E
Deficiency
Wilson Plywood and Door,
11416-77
10-31-74
$ 4,875.00
Inc. (formerly Venture
10-31-75
9,247.61
Sales, Inc.)
Inland Sales Co., Inc.
1460-78
10-31-74
4,874.99
10-31-75
9,247.61
Paint Sundries Co., Inc.
1513-78
10-31-74
2,011.92
10-31-75
2,018.34
Dallas Wholesale Builders
1514-78
10-31-74
4,875.00
Supply, Inc.
10-31-75
9,247.60
This Court denied respondent's motion on August 1, 1979, because at the hearing thereon petitioners elected to adopt a plan to allocate the $25,000 surtax exemption amongst three of the four corporations should we decide the issue therein for respondent.
3. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect in the years in issue.↩
4. The parties in their briefs point to certain obvious errors in the stipulated facts and we have found others. None of these errors are material to the determination of the issue presented. However, when needed to explain figures that otherwise appear inconsistent, we will note these errors.↩
5. The parties stipulated that Paint Sundries was incorporated on November 1, 1969. At trial the witness for petitioners testified that Paint Sundries existed a number of years prior to the purchase of 100 percent of its outstanding stock by Dallas Wholesale. The parties also stipulated that Dallas Wholesale purchased all of the Paint Sundries outstanding stock on July 15, 1969, approximately 10 weeks prior to the stipulated incorporation date of Paint Sundries. The stipulated incorporation date is obviously in error.
6. The parties stipulated that the corporation was incorporated as Venture Sales on July 1, 1973. However, at trial, the testimony of petitioners' only witness indicates that Venture Sales operated for years as a corporation before Dallas Wholesale purchased the Venture Sales stock on July 1, 1973.
7. Because a contrary fact has not been brought to our attention or proved, we assume that the capital stock composition of each of the four corporations herein involved consisted of one class of stock per corporation, whether the shares were restricted or unrestricted.↩
8. The parties stipulated that Dallas Wholesale purchased all outstanding capital stock of each Paint Sundries and Inland Sales. However, Charles W. Fletcher testified at trial that he previously bought and continued to own 610 shares of Paint Sundries unrestricted stock and 3,050 shares of Inland Sales unrestricted stock at the time of the Dallas Wholesale purchase. Other persons also held unrestricted shares of each Inland Sales and Paint Sundries according to the stipulations of the parties on the basis of which we make findings.↩
9. Insofar as here pertinent, the February 11, 1970, agreement provides: III It is further agreed that if the employment of either Fletcher or Ellsworth with Inland Sales and/or Paint Sundries ceases, for whatever reason, be it voluntary or involuntary, then in such event, Dallas Wholesale shall have the option to repurchase the stock of the party whose employment has so ceased, including stock in both Inland Sales and Paint Sundries, at the then book value of said shares of stock as such book value may be at such time determined by the audit of the regular company auditor. If the reason for cessation of such employment be for any cause other than that of the death of such employee, Dallas Wholesale shall give notice of its intention to exercise such option of repurchase of said shares of stock within thirty (30) days after the termination of such employment. * * * IV. Further, Fletcher and Ellsworth agree that they will not sell nor offer for sale one or more of the aforesaid shares of stock in said corporation without first in writing offering said shares of stock for sale unto Dallas Wholesale at the book value of said shares of stock as such value shall be determined to be as of the date of such offer of sale thereof by the offering party unto Dallas Wholesale. Dallas Wholesale shall, if it desires to purchase said shares, advise the offering party of its intent to so do, within ten (10) days of said offer * * *. V. Ellsworth and Fletcher, each and both, agree that in the event the holder or holders of a majority of the outstanding shares of stock of either Inland Sales Company or Paint Sundries Company, but not necessarily all of such shareholders, should desire to sell all of their shares of stock in said Inland Sales Company and Paint Sundries Company to a third person or persons, firm or firms, or corporation or corporations, then Ellsworth and Fletcher agree that they will convey their shares to said purchaser or purchasers, at the same sales price per share as the average price per share paid to Dallas Wholesale or the majority shareholder, or the average price per share as computed under the sales price of the total number of shares being sold, whichever shall be the greater. VI. In the event of the death of Fletcher or Ellsworth, Dallas Wholesale shall have the right to purchase the shares owned by such deceased party on the date of his death from his or her legal heirs, at the book value of such stock as determined by the company auditor, and such applies to shares in both Inland Sales Company and Paint Sundries Company, as such book value existed on the date of the death of the deceased shareholder. In the event Dallas Wholesale shall desire to exercise said option, it shall have thirty (30) days after the death of the deceased shareholder to give notice in writing of its intention to exercise said option * * *. It is specifically agreed by the parties hereto that all options and restrictions herein specified shall apply to any stock dividends, if any, which may be declared on the stock which is the subject of this contract. * * *
It is further specifically agreed that notice of this contract shall be given to the secretary of the three corporations herein mentioned, and that indication of the existence of said contract be noted on the shares herein involved, as well as any stock dividends declared thereon.↩
10. The parties stipulated that Mr. Fletcher purchased 270 shares of Paint Sundries stock, and the stock certificate issued and testimony at trial support this fact. However, at another point in the stipulation as hereinafter noted the number of shares purchased by Mr. Fletcher is shown as 275.
11. In the stipulation the parties listed 275 shares as owned by Mr. Fletcher. However, the number of shares stipulated as owned by Him elsewhere, which seems to be the correct number is 270. Using the correct figure of 270, the percentage of shares outstanding totals 99.95 percent and the number of outstanding shares equals 9,995.↩
12. We have use the figure of 2,400 shares as the amount sold to each Mr. Davis and Mr. Preddy even though the parties stipulated that each Mr. Davis and Mr. Preddy purchased 2,450 shares of Wilson Plywood stock on or about July 11, 1973. However, the July 11, 1973, shareholder agreement that lists the restrictions imposed on the July 11, 1973, purchased shares refers to 2,400 shares owned at that time by each Mr. Davis and Mr. Preddy. The Wilson Plywood by-laws also show Mr. Davis and Mr. Preddy as each owning 2,400 shares of Wilson Plywood restricted stock. Moreover, the parties stipulate that Mr. Preddy bought 250 shares of restricted stock on February 7, 1974. The parties further stipulate that during the tax years in issue each Mr. Preddy and Mr. Davis held 2,450 shares of restricted Wilson Plywood capital stock. No mention is made of any further stock purchases by Mr. Davis. There is no explanation in the record for the discrepancies. 13. In pertinent part the July 11, 1973, stockholders contract provided: KNOW ALL MEN BY THESE PRESENTS: WHEREAS, VENTURE SALES, INC. is a Texas Corporation having under its charter authorized capital stock of Ten Thousand (10,000) Shares of par value of One ($1.00) Dollar per share, said corporation being hereinafter referred to as "Venture;" and, WHEREAS, RONALD L. DAVIS, hereinafter referred to as "Davis," owns Two Thousand and Four Hundred (2,400) Shares of the stock of Venture; and JAMES M. PREDDY, hereinafter referred to as "Preddy," owns Two Thousand and Four Hundred (2,400) Shares of the stock of Venture; and DALLAS WHOLESALE BUILDERS SUPPLY, INC., hereinafter referred to as "Dallas Wholesale," owns Five Thousand and One Hundred (5,100) Shares of the outstanding stock of Venture, and the remaining One Hundred (100) shares of authorized Venture stock being unissued and unsubscribed for, and thus the stockholders above enumerated own all of the outstanding stock of venture; and, WHEREAS, said stockholders are desirous of entering into a contract with reference to the shares of stock owned by them, granting unto one or the other certain options to purchase stock under the terms and conditions as hereinafter set out; and, * * *. I
Davis does by this instrument grant unto Preddy and to Dallas Wholesale the following options to purchase any shares of his stock in Venture [Wilson Plywood] offered for sale, under the following terms and conditions: In the event Davis offers all or any of his shares in said corporation for sale, and in the further event he shall receive an offer to purchase said shares so offered he shall deliver by written instrument a copy of said offer to Preddy, as well as to Dallas Wholesale, and Preddy shall have the right to purchase said shares on the same terms and conditions as said offer, for a period of fifteen (15) days after the delivery of said offer by Davis to Preddy. In the event Preddy shall not exercise his option to consummate such purchase within said period of time, Davis and Preddy shall jointly advise Dallas Wholesale, in writing, of such action by Preddy, and Dallas Wholesale shall have the right to purchase said shares so offered for sale, under the terms and conditions of the bona fide offer, said option to be for a period of fifteen (15) days subsequent to the initial option period of Preddy. In the event Dallas Wholesale does not exercise its option, Davis shall be free to consummate the sale but only unto said offeror under the terms of the offer delivered to Preddy and Dallas Wholesale. II. Preddy does by this instrument grant unto Davis and to Dallas Wholesale option to purchase any shares of his stock in Venture offered for sale, under the same terms and conditions provided hereinabove as to Davis' stock, in Paragraph I of this agreement. III. Dallas Wholesale does by this instrument grant unto Davis and unto Preddy, each individually, an option to purchase one-half (1/2) of any shares of its stock in Venture offered for sale, under the same terms and conditions provided hereinabove as to Davis' option granted unto Preddy, in Paragraph I of this agreement, so that Davis shall have such option to purchase 1/2 of any shares so offered for sale, and Preddy shall have such option to purchase 1/2 of any shares fo offered for sale. Such option of Davis to purchase such stock may be assigned unto Preddy, and the option of Preddy to make such purchase may be assigned unto Davis; but such right is not assignable unto any other person, firm or corporation, without the consent of Dallas Wholesale. IV. In the event of the termination of employment with Venture of Davis, Preddy shall have the option to purchase all of the shares of Davis in Venture, the purchase price therefore being book value of such shares of stock, as determined by the regular CPA normally used by Venture, as such price is determined as of the last business day of the month of such termination, payment therefor to be made unto Davis within thirty (30) days following the last day of the month in which such termination occurs. In the event Preddy does not desire to exercise his option to purchase said shares of stock, he shall in writing notify both Davis and Dallas Wholesale, in which event Dallas Wholesale shall have thirty (30) days following the last day of the month in which such termination occurs, or thirty (30) days following the receipt of notification from Preddy that he does not wish to purchase such shares of stock, whichever shall be the later date. Failure of Dallas Wholesale to purchase such shares shall release said shares from transfer restrictions for a period of sixty (60) days thereafter; or shall enable Davis to retain ownership of such shares, subject to all other options herein contained.
V. In the event of the termination of employment with Venture of Preddy, Davis and Dallas Wholesale shall have the same options to purchase the stock in Venture owned by Preddy at the time of his termination, under the same terms and conditions provided hereinabove in Paragraph IV as to the termination of employment of Davis by Venture in the favor of Preddy and Dallas Wholesale. VI. In the event of the death of Davis, Preddy shall have option to purchase all of the stock of Davis in Venture from the estate of Davis on the following terms and conditions: The purchase price shall be the book value of said stock as determined by the regular CPA normally used by Venture, as such price is determined as of the last business day of the month of the death of Davis. The purchase price shall be paid in cash within sixty (60) days after the last day of month in which Davis shall have died. In the event said option is not exercised within said period of time, same shall expire and Dallas Wholesale shall have the option to purchase said shares from the estate of said decedent at the same purchase price, payable, however, in cash ninety (90) days after the last day of the month in which Davis shall have died. In the event Dallas Wholesale does not exercise said option within said period of time and consummate same said option shall expire. VII. In the event of the death of Preddy, the same option rights shall exist in the favor of Davis and Dallas Wholesale, under the same terms and conditions, as hereinabove recited in Paragraph VI as to options in existence in the favor of Preddy and Dallas Wholesale in the event of the death of Davis.↩
14. Carla Diane Potter is the daughter of Vernon Potter. ↩
15. Pamela Denise Hill is the adult daughter of Vernon Potter.↩
16. See footnote 2 as to the election subsequently made by petitioners.↩
17. In pertinent part, section 1561(a)(1)provides: SEC. 1561. LIMITATIONS ON CERTAIN MULTIPLE TAX BENEFITS IN THE CASE OF CERTAIN CONTROLLED CORPORATIONS. (a) General Rule. -- The component members of a controlled group of corporations on a December 31 shall, for their taxable years which include such December 31, be limited for purposes of this subtitle to-- (1) one $25,000 surtax exemption under section 11(d), * * *
The amount specified in paragraph (1) shall be divided equally among the component members of such group on such December 31 unless all of such component members consent (at such time and in such manner as the Secretary or his delegate shall by regulations prescribe) to an apportionment plan providing for an unequal allocation of such amount. The amounts specified in paragraphs (2) and (3) shall be divided equally among the component members of such group on such December 31 unless the Secretary or his delegate prescribes regulations permitting an unequal allocation of such amounts. ↩
18. Section 1563 defines a "controlled group of corporations" as follows: SEC. 1563. DEFINITIONS AND SPECIAL RULES. (a) Controlled Group of Corporations. -- For purposes of this part, the term "controlled group of corporations" means any group of (1) Parent-subsidiary controlled group. -- One or more chains of corporations connected through stock ownership with a common parent corporation if-- (A) stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of each of the corporations, except the common parent corporation, is owned (within the meaning of subsection (d)(1)) by one or more of the other corporations; and (B) The common parent corporation owns (within the meaning of subsection (d)(1)) stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of at least one of the other corporations, excluding, in computing such voting power or value, stock owned directly by such other corporations. ↩
19. Section 1563(c)(2)(A)(iii) provides in relevant part: (c) Certain Stock Excluded. -- * * *
(2) Stock treated as "excluded stock".-- (A) Parent-subsidiary controlled group.--For purposes of subsection (a)(1), if a corporation (referred to in this paragraph as "parent corporation") owns (within the meaning of subsections (d)(1) and (e)(4)), 50 percent or more of the total combined voting power of all classes of stock entitled to vote or 50 percent or more of the total value of share of all classes of stock in another corporation (referred to in this paragraph as "subsidiary corporation"), the following stock of the subsidiary corporation shall be treated as excluded stock-- * * (iii) stock in the subsidiary corporation owned (within the meaning of subsection (d)(2)) by an employee of the subsidiary corporation if such stock is subject to conditions which run in favor of such parent (or subsidiary) corporation and which substantially restrict or limit the employee's right (or if the employee constructively owns such stock, the direct owner's right) to dispose of such stock, or↩
20. In the instant case, as a result of respondent's computational error as discussed in footnotes 2 and 16, and the subsequent election by petitioners of an apportionment plan, the one surtax exemption would be apportioned amongst Dallas Wholesale, Paint Sundries, and Inland Sales. No part of the surtax exemption would be apportioned to Wilson Plywood.↩
21. This concession by petitioners is tantamount to conceding that the restriction "runs in favor of such parent" within the meaning of section 1563(c)(2)(A)(iii)↩. 22. As indicative of the declared purpose, petitioners cite an example of stock held as community property under Texas law. On brief petitioners state that because Mr. Fletcher purchased the February 11, 1970, Inland Sales and Paint Sundries capital stock with community funds, Mrs. Fletcher effectively owned one-half of the purchased shares (500 shares of Inland Sales and 135 shares of Paint Sundries) even though the stock certificate listed Charles W. Fletcher as the sole owner. Petitioners imply that if Dallas Wholesale were without the right of first refusal, Mrs. Fletcher might dispose of her portion of the shares to outsiders. This reasoning does not support petitioners' position that the right to dispose of the shares was not substantially restricted or limited. Under Texas law, community property held in the name of one spouse is owned by both spouses, but in order to protect third parties the property is subject to the sole management, control, and disposition of the spouse whose name appears on the document evidencing ownership. Tex. Fam. Code Ann. Sec. 5.24 (Vernon 1975). Sec. 5.24 provides that: SEC 5.24. Protection of Third Persons (a) During marriage, property is presumed to be subject to the sole management, control, and disposition of a spouse if it is held in his or her name, as shown by muniment, contract, deposit of funds, or other evidence of ownership, or if it is in his or her possession and is not subject to such evidence of ownership.
(b) A third person dealing with a spouse is entitled to rely (as against the other spouse or anyone claiming from that spouse) on that spouse's authority to deal with the property if: (1) the property is presumed to be subject to the sole management, control, and disposition of the spouse; and (2) the person dealing with the spouse: (A) is not a party to a fraud upon the other spouse or another person; and (B) does not have actual or constructive notice of the spouse's lack of authority. See also Evans v. Muller,516 S.W.2d 923 (Tex. 1974) reversing 510 S.W.2d 651↩ (Tex. Civ. App. 1974). By virtue of Texas law Mr. Fletcher retained the right to dispose of all 1,000 shares of Inland Sales capital stock and all 270 shares of Paint Sundries stock. Therefore, the declared purpose of preventing problems which might arise from domestic disputes is strictly imaginary.
23. The cases decided by this Court and other courts on the topic of whether an employee's right to dispose of his stock is substantially restricted or whether the restriction runs in favor of the parent or subsidiary corporation include: Crow-Burlingame Co. of Pine Bluff v. Commissioner,65 T.C. 785 (1976), affd. 547 F.2d 1173 (8th Cir. 1976); Barton Naphtha Co. v. Commissioner,56 T.C. 107 (1971); Superior Beverage Co. of Marysville, Inc. v. Commissioner,525 F.2d 186 (9th Cir. 1975), reversing 58 T.C. 918 (1972); Mid-America Industries, Inc. v. United States,477 F.2d 1029↩ (8th Cir. 1973).